597 A.2d 1359

Kevin WIGGINS

v.

STATE of Maryland.

No. 139, Sept. Term, 1989.

Court of Appeals of Maryland.

Nov. 8, 1991.

554

Melissa M. Moore, Asst. Public Defender and Julia Doyle Bernhardt, Asst. Public Defender, Alan H. Murrell, Public Defender, Baltimore, on brief, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen., J. Joseph Curran, Jr., Atty. Gen., Baltimore, on brief, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE *, RODOWSKY, McAULIFFE, CHASANOW and MARVIN H. SMITH, Judge of the Court of Appeals (retired, specially assigned), JJ.

MURPHY, Chief Judge.

Kevin Wiggins was convicted at a nonjury trial in the Circuit Court for Baltimore County (Hinkel, J.) of willful, deliberate, and premeditated murder, robbery, and two counts of theft. On October 18, 1989, following a jury sentencing hearing, Wiggins was determined to be a principal in the first degree on the murder count. He was sentenced to death in pursuance of the State's notice that it sought that penalty, as authorized by Maryland Code (1987 Repl.Vol.), Art. 27, § 412(b).

On appeal from these judgments, Wiggins maintains that he is entitled to a new trial as to his guilt of these offenses because (1) the evidence was insufficient to establish that he was the perpetrator of the crimes and (2) the trial court erred in denying his motion for a new trial. Wiggins also urges, for twelve separate reasons, that the imposition of the death penalty was improper and a new sentencing hearing is therefore required.

---

* Cole, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Art. IV, Sec. 3A, he also participated in the decision and adoption of this opinion.

I.

## *The Trial*

Florence Lacs, the seventy-seven-year-old murder victim, resided at the Clark Manor Apartments in Woodlawn, Maryland. On Saturday afternoon, September 17, 1988, at approximately 3:50 p.m., her dead body was found in the bathtub of her apartment. She was lying on her side, half-covered by cloudy water of a slightly greenish hue. She was fully clothed in a blue skirt, a white blouse, and white beads. She was not wearing underpants and her skirt was pulled up to her waist in the back. No shoes were on the body, but one bedroom slipper was floating in the bathtub (its mate was lying in the hallway of her apartment).

The evidence at trial showed that on Thursday, September 15, the victim drove Mary Elgert to a luncheon. Elgert testified that the victim was then wearing a light blue skirt, white blouse, and white shoes. She said that the victim drove her home from the luncheon at 4 p.m. that day.

Edith Vassar was also in attendance at the luncheon. She testified that on the day after the luncheon, Friday, September 16, at approximately 10 a.m., the victim phoned her and they discussed an event that occurred at the luncheon the previous day.

Elizabeth Lane was present at the luncheon on September 15. She recalled driving by the victim's apartment complex the following day at 4 p.m. and noted that her car was not in the parking lot. When the victim failed to attend a scheduled card game at Lane's house on Saturday, September 17, the police were contacted at 2 p.m. and Ms. Lacs was reported missing. Lane told the police that she had last seen the victim on September 15 and that she was wearing a red dress at that time.

In the afternoon of Saturday, September 17, the apartment manager, Joseph Thiel, was alerted by the police and he entered the victim's apartment. He testified that the deadbolt lock on the door was unlocked, but that the knob lock was locked. He discovered the victim lying dead in the

bathtub. The police arrived shortly thereafter. They found no evidence of forced entry into the apartment, but it had been partially ransacked. Several drawers had been removed from various locations within the living and dining rooms and were found on the floor. The night stand drawer was pulled out and its contents were in disarray. The headboard of the bed had two built-in enclosures; they stood open and their contents were likewise in disarray. A drawer from the buffet was on the bed with items strewn all around it. The bed was mussed, with the mattress sitting askew on the box spring; the pillow cases were missing. A damp cloth was lying on the dining room table and a damp towel was lying on the victim's bed. In the kitchen, the window was slightly open but the screen was intact. The cabinets were open and some bottles of household cleaner were lying on the floor. The tap was running in the kitchen sink. In the bathroom on the sink were a spray can of insecticide, a bottle of household cleaner and a bottle of dishwashing liquid.

On the floor inside the front door of the apartment was a baseball cap which displayed a Ryder Rental Truck logo on its bill. On the coffee table in front of the sofa were two T.V. Guides, one of which was dated from September 10 to 16; the evening programs had been marked by pen through September 15; and a bookmark had been inserted at the page delineating the September 15 programs. The other T.V. Guide was for programs from September 17 to 23; it was unopened.

Seven latent fingerprints were recovered from inside the entrance door of the victim's apartment, the archway wall of the kitchen, and the doorjamb leading into the bathroom. The police also processed what appeared to be wet wipe marks on the front face of an end-table drawer found on the living room sofa. These marks, however, had no comparison value. Similar markings were observed on a cleaning bottle in the bathroom. The seven latent prints were compared to Wiggins's prints and found not to match. Two of the prints were identified as being made by one of the police

officers on the scene. The other five prints were not identified.

Paramedics arrived on the scene and pronounced the victim dead at 3:50 p.m. At that time, the paramedic noted that there was expiratory cyanosis about the victim's lips and face, that her pupils were dilated, and that her arm and jaw were rigid. She was removed from the bathtub during the evening of Saturday, September 17, in the presence of Dr. Stanley Felsenberg, the Deputy State Medical Examiner, who arrived on the scene at 9 p.m. The body was transported to the Medical Examiner's office in Baltimore, and tagged and refrigerated at approximately midnight.

Dr. Margarita Korell, Assistant State Medical Examiner, performed an autopsy on the body on the morning of September 18. She concluded that the cause of death was drowning and that the manner of death was homicide. She found a contusion on the dorsal surface of the left hand and a tiny hemorrhage in the neck area. She testified that these injuries were produced by "some external force" and were consistent with a struggle prior to the victim's death. Asked whether she could state "the minimum amount of time Ms. Lacs had been deceased," Dr. Korell responded that there was no way that she could say for certain when the victim died. She "guessed" that it could have been more or less than forty-eight hours, depending upon a number of factors. Upon objection, the court struck Dr. Korell's testimony "with respect to the time of death." It permitted in evidence, however, that Dr. Korell was unable to state, with a reasonable degree of medical certainty or probability, "what the maximum period of time was."

Chianti Thomas, age twelve at the time of trial, testified that on September 15, at approximately 4:30 or 5 p.m., she was visiting with Chantell Greenwood and Shanita Patterson at an apartment next to the victim's apartment. When they were leaving the apartment, Shanita had difficulty in locking her apartment door and sought assistance from the victim. While the victim was attempting to help lock the door, a man, later identified as Wiggins, volunteered his

assistance. When the telephone rang inside Shanita's apartment, she and Chantell went to answer it. While they were gone, Chianti heard Wiggins thank the victim for watching some sheetrock for him and heard the victim converse briefly with Wiggins. The evidence disclosed that this conversation occurred at approximately 5 or 5:30 p.m. Thereafter, the girls left the apartment building. Several weeks later, Chianti was shown photographs of six men. She selected Wiggins's photograph as the person that "looked the closest to the man that was in the building." Chianti was unable to identify Wiggins at the trial.

Robert Weinberg, a contractor, testified that he was performing work at the Clark Manor Apartments at the time of the victim's death. He said that he had employed Wiggins on September 14 and that on September 15, while Wiggins was carrying equipment from the apartment to a truck, the victim called out of her apartment window and expressed concern to Wiggins that the truck might block her car. Weinberg remembered assuring the victim that the truck did not block her car. Weinberg released Wiggins from work on September 15, sometime between 4 and 4:45 p.m. He said that approximately twenty-five to thirty-five minutes thereafter, Wiggins told him that he had moved some sheetrock from one side of the building to another, a task that Weinberg had not asked him to perform. Weinberg testified that it would have taken only two minutes for Wiggins to move the sheetrock. Weinberg also testified that Wiggins appeared for work on Friday, September 16, but left early, stating that he was being evicted that day.

The evidence disclosed that on the evening of September 15, at about 7:45 p.m., Wiggins, driving the victim's orange Chevette, went to the home of his girl friend, Geraldine Armstrong. According to her testimony, they went shopping and made several purchases, using the victim's credit cards, which Wiggins told Armstrong belonged to his aunt. Armstrong said that she signed the victim's name to the charge slips because Wiggins said his handwriting was bad. The following day, September 16, Wiggins drove Armstrong

to work in the victim's car, after which they again went shopping, using the victim's credit cards to purchase additional items, including a diamond ring at a J.C. Penney store, for which they received a certificate. Wiggins, she said, gave a false name and address for the certificate. On Saturday, September 17, Wiggins and Armstrong pawned a ring which Wiggins told Armstrong he had found in the car. The ring belonged to the victim.

On the evening of September 21, Wiggins and Armstrong were arrested by the police while driving in the victim's vehicle. At that time, Wiggins told the police that Armstrong "didn't have anything to do with this." In a statement to police, Wiggins claimed that he found the victim's car with the keys in it on a restaurant parking lot on Friday, September 16; that the credit cards were in a bag on the floor of the car; and that the ring was also found in the car. Wiggins admitted using the credit cards and pawning the ring. He stipulated with the State that he used the victim's credit cards to make several purchases on the evening of Thursday, September 15.

At the time of Wiggins's arrest, the police seized a rubber glove from a pocket in his trousers. There was no evidence of an association between the glove and the various liquids in the victim's bathroom.

The State presented testimony from Christopher Turner, who claimed to have met Wiggins during his pretrial incarceration in October, 1988. Turner, who has a history of serious mental illness and drug abuse, testified that Wiggins told him that he had stolen a car and killed the lady to whom the car belonged. Turner said that Wiggins admitted that he had kicked the lady and beaten her, and then drowned her in the bathroom, and had put something like lye or ammonia in the water. According to Turner, Wiggins said that he had taken the lady's purse, credit cards, and some money, after which he drove away in her car. Turner also testified that Wiggins took a ring from the victim's finger; that he used the credit cards to buy clothes;

and that he also permitted his girlfriend to use the credit cards.

John McElroy testified that he met Wiggins in the county detention center and that Wiggins asked him whether, at his trial, the authorities could use a hair sample against him. McElroy said that Wiggins admitted that he had hit a lady in the back of the head and put her in the bathtub of her house, drowned her, and then took $15,000 from the house. McElroy also testified that Wiggins told him that he had a girlfriend named Geraldine.

The defense presented the testimony of Gregory Kauffman, a physician with expertise in the field of forensic pathology. He testified that there was nothing in the autopsy report that made drowning seem a likely cause of the victim's death. He said that drowning seemed unlikely because the body showed no evidence of a struggle. He agreed that the manner of death was homicide. As to the time of death, Dr. Kauffman said that when the victim's body was first photographed at 9 p.m. on Saturday, September 17, she had been dead a maximum of eighteen hours. He reasoned that there were no decompositional changes at that time, which would have been evident in bodies that had been dead longer than eighteen hours. Dr. Kauffman referred especially to the inside and back of the left arm. In these areas, he said, there was lividity, or settling of the blood, and that decompositional changes occur first in areas where the blood has settled. He noted the absence of swelling or bloating, and the absence of marbling, and skin slippage. Dr. Kauffman further opined that at the time the autopsy was performed, rigor mortis was fully developed, and that it had been broken. In this regard, he said that rigor mortis becomes fully developed around eight to twelve hours after death. Dr. Kauffman noted that the body was refrigerated at the Medical Examiner's office shortly before midnight; and he believed that, at that time, the victim had been dead twenty-one hours at the most.

After hearing all of the evidence, Judge Hinkel found Wiggins guilty of first-degree murder, robbery, and theft.

He found as a fact that Wiggins worked at the Clark Manor Apartment complex and knew the victim and which car she owned. He further found that it was Wiggins that Chianti Thomas saw outside of the victim's apartment on September 15, and that Wiggins was in possession of the victim's automobile, credit cards, and ring later on that day. He concluded that the ransacking of the victim's apartment took place on September 15, between the time that Wiggins was released from work and the time that he arrived at the home of Geraldine Armstrong in the victim's car. The court disbelieved Wiggins's statement to the police that he found the car in a restaurant parking lot on September 16. It found as a fact that the credit cards and car keys were taken from the apartment after it had been ransacked.

Judge Hinkel determined that Ms. Vassar was mistaken when she said that she had spoken to the victim on the morning of September 16, and that Ms. Elgert was mistaken when she told the police that the victim was wearing a red dress on Thursday, September 15. The court believed that the victim was wearing a blue skirt and white blouse on that day, this being the clothes she was wearing when she was found in the bathtub. The court did not credit Dr. Gregory Kauffman's testimony as to the time of death; rather, it was persuaded that Wiggins murdered the victim on September 15 and that the killing was done willfully, deliberately, and with premeditation and in the course of a robbery. In so concluding, Judge Hinkel stated that he did not believe the testimony of either John McElroy or Christopher Turner, each of whom claimed that Wiggins admitted murdering and robbing the victim.

## II.

### The Sentencing Proceeding

As Wiggins elected to be sentenced by a jury, much of the testimony adduced at the trial was repeated. There were, however, some differences between the evidence offered at trial and at the sentencing proceeding.

Dr. Korell told the jury that the victim died of drowning and that the manner of death was homicide. She testified that the victim sustained a contusion of the left hand and that it was a traumatic defensive-type injury. She made no mention of the hemorrhage in the victim's neck area. As to the time of death, Dr. Korell said that taking into account a number of factors, including that the body was refrigerated the entire night prior to the autopsy, she could not pinpoint the time of death. She estimated that the victim "could have died 24 or 48 hours before she was photographed at the crime scene at 9 p.m. on September 17," or earlier if, as stated by the paramedic, rigor mortis was present at 4 p.m. on that day.

Dr. Ann Dixon, the Deputy Chief State Medical Examiner, testified that the victim died at least twenty-four hours before Dr. Felsenberg examined the body at the crime scene and that death could have occurred thirty-six or forty-eight hours prior to that examination, or even farther back than that.

Chantell Greenwood testified that the victim was wearing a red pleated skirt and a long-sleeved white blouse when she last saw her on September 15 in the apartment hallway. She said that on that date, at approximately 5:40 p.m., she heard the victim and a painter exchange a few words in the hallway. Chianti Thomas reiterated her testimony about her visit to Shanita, the victim's neighbor, on September 15. She told the jury that the girls had difficulty locking the door behind them; that they enlisted the help of the victim; that a man appeared on the scene at that time; and that she observed a brief exchange of words between the victim and the man she later identified as Wiggins. Thus, Chianti's trial testimony differed from her testimony at sentencing in her identification of Wiggins. Before the trial, Chianti had selected Wiggins's photograph from a group of photographs that the police had shown to her. She was, however, unable to make an in-court identification. At the sentencing hearing, however, when the prosecutor asked

Chianti, "[a]nd whose picture did you pick," she made an in-court identification of Wiggins.

Dr. Silvia Camparini, an expert pathologist, testified for the defense that the body had not been dead more than twenty-four hours when Dr. Korell performed the autopsy at 9 a.m. on September 18.

In its sentencing determination, the jury concluded beyond a reasonable doubt that Wiggins was a principal in the first degree to the murder of Florence Lacs, and that one aggravating circumstance had been proven, namely, that Wiggins committed the murder in the course of robbing the victim. The jury unanimously found by a preponderance of the evidence that one mitigating circumstance existed, namely, that Wiggins had not been previously convicted of a crime of violence. An additional mitigating circumstance was found by one or more of the jurors, but fewer than all twelve, namely, Wiggins's "background." The jury unanimously found that the State proved by a preponderance of the evidence that the proven aggravating circumstance outweighed the mitigating circumstances and it imposed the death penalty.

## III.

Wiggins maintains that because his convictions rest solely upon circumstantial evidence, they cannot be sustained unless they are inconsistent with any reasonable hypothesis of innocence. For this proposition, he relies upon *Wilson v. State*, 319 Md. 530, 535–37, 573 A.2d 831 (1990) and *West v. State*, 312 Md. 197, 207–13, 539 A.2d 231 (1988). He urges that because the circumstances permit a reasonable hypothesis of his innocence of robbery and murder, the evidence is not legally sufficient to establish that he was the perpetrator of those offenses. In this regard, Wiggins postulates that a substantial number of hours intervened between the time that he came into possession of the victim's property and the time that she died. He contends that the State's evidence does not preclude the reasonable hypothesis that

he entered the victim's apartment and stole her ring, car keys, and credit cards from her purse while she was attempting to help her neighbor lock her door. Wiggins suggests that he could have easily slipped into the victim's apartment and taken these items from her purse, which could have been resting just inside the door, or otherwise in plain view. He readily acknowledges that the State proved a legally sufficient case for a theft conviction, based on his subsequent possession of the victim's property and on his presence at the crime scene; but he argues that this alone does not prove that he committed robbery at the time he came into possession of the victim's property. Nor, he says, does it support an inference that he is guilty of murder, especially in view of the State's failure to establish that the victim died on September 15. As to this, Wiggins invites attention to Dr. Kauffman's testimony that the victim did not die on September 15 but more likely on September 17. Moreover, Wiggins points to other evidence that mitigates against his guilt, namely, the testimony of the victim's two friends, one of whom testified that she received a telephone call from the victim on Friday morning, September 16, and the other who described the victim as wearing a red dress on Thursday afternoon, September 15. This evidence, according to Wiggins, highlights the State's failure to prove that the victim was dead before or at about the same time that he came into possession of her car and other belongings on September 15.

In *Tichnell v. State*, 287 Md. 695, 415 A.2d 830 (1980), an appeal in a death penalty case, we stated that the standard to be applied in reviewing the sufficiency of the evidence to support a criminal conviction was " 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.' " *Tichnell*, 287 Md. at 717, 415 A.2d 830 (quoting *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979)). This standard does not require a court to " 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt' "; rather, the standard to apply is

" 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Jackson v. Virginia, supra,* 443 U.S. at 318–19, 99 S.Ct. at 2788–89 (emphasis in original). We recently restated this standard of review in these terms: " '[T]he constitutional standard of review is "whether after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " *Wilson v. State, supra,* 319 Md. at 535, 573 A.2d 831 (quoting *West v. State, supra,* 312 Md. at 207, 539 A.2d 231). In this regard, under Maryland Rule 8–131(c), we defer to the factual findings of the trial judge in a nonjury case, unless they are clearly erroneous, giving due regard to the opportunity of the trial judge to observe the demeanor of the witnesses and to assess their credibility. These principles of appellate review of criminal convictions are applicable in all cases, including those involving circumstantial evidence. *Wilson v. State, supra,* 319 Md. at 535–37, 573 A.2d 831.

 Taking into account the circumstantial nature of much of the evidence against Wiggins, and considering all of the evidence in the case in a light most favorable to the State, we conclude that Judge Hinkel, as trier of fact, rationally determined that Wiggins was the perpetrator of the offenses and that he committed the crimes on September 15. He considered but rejected Wiggins's argument that the circumstances, taken together, demonstrated a reasonable hypothesis of his innocence. By his express factual findings, as previously set forth, Judge Hinkel did not credit any of Wiggins's evidence that the robbery and murder were committed at a time subsequent to his theft of the victim's car and other personal property. That the expert witnesses were either unable to agree, or differed as to the time of death, does not render clearly erroneous Judge Hinkel's ultimate finding that Wiggins robbed and murdered the victim on September 15.

## IV.

Wiggins contends that the trial court erred in denying his motion for a new trial. He points out that evidence was adduced at the hearing on the motion which disclosed that prior to trial Dr. Korell told defense counsel that the victim died from four to ten hours before her body was discovered on September 17, and that the outside limit was twenty-four hours. The evidence also showed that two days later, after Dr. Korell had conferred with Dr. Ann Dixon, the Deputy State Chief Medical Examiner, she told defense counsel that her opinion had changed and that the time of death could have been forty-eight hours before the body was discovered.

Wiggins notes that at the trial Dr. Korell testified that she was unable, with reasonable medical certainty, to establish the time of death. Wiggins next notes that Dr. Korell testified at the sentencing hearing that the victim had been dead twenty-four to forty-eight hours prior to 9 p.m. on September 17.

On the basis of this evidence, Wiggins argues that Dr. Korell's expert opinion at the sentencing hearing was newly discovered evidence within the contemplation of Maryland Rule 4–331(c), justifying the award of a new trial. He claims that this opinion was clearly material and would have produced an acquittal since the outside limit of her range established that the victim was alive after he came into possession of her property. According to Wiggins, had this testimony been introduced at the trial, it would have been consistent with the defense expert's opinion as to the time of death and would have exonerated Wiggins from guilt. In other words, Wiggins says that had the evidence at trial included Dr. Korell's revised opinion, all of the medical evidence introduced at the trial would have been consistent only with his innocence.

In a similar vein, Wiggins argues that Dr. Korell's "shifting opinions on the time of death" denied him a fair trial. He says that "matters would have been different" if Dr.

Korell's opinion at trial had been consistent with her opinion at the sentencing hearing.

■ Assuming, *arguendo*, that Dr. Korell's testimony at the sentencing hearing amounted to newly discovered evidence, the standard for determining whether a new trial should be granted based upon that evidence is whether it may have produced a different result, *i.e.*, that "there was a substantial or significant possibility that the verdict of the trier of fact would have been affected." *See Yorke v. State*, 315 Md. 578, 588, 556 A.2d 230 (1989).

■ As earlier indicated, in rendering his verdict at the trial, Judge Hinkel stated:

"Now, a lot has been made over the exact time of death. I don't know the exact time of death. I am persuaded, however, from all the evidence that the death of Mrs. Lacs did not occur sometime between 9 p.m. on September 17th and 3:00 a.m. on 9–17, which would be the 18 hour period that was testified to by Dr. Kauffman. I am persuaded that it occurred on Thursday the fifteenth of September."

In denying the motion for a new trial, the Judge Hinkel stated:

"But there's so many other facts in this case and there's nothing certain about medical testimony of this sort. The state and the defense knew that the medical profession is not equipped or prepared to state with any degree of certainty, not even probability, it appears, as to matters of this nature. But all the other evidence in this case certainly was sufficient for me, at the guilt/innocence stage, and for the jury in the sentencing phase, to determine that Mr. Wiggins was a principal in the first degree."

It is thus readily apparent that the trial judge did not rely upon Dr. Korell's trial testimony with respect to the time of death. Indeed, her estimate given at the trial, which she characterized as a "guess," was that the victim could have been dead more or less than forty-eight hours when her

body was discovered. This testimony, upon Wiggins's objection, was stricken and thus not considered at the trial.

In denying Wiggins's new trial motion, Judge Hinkel recognized that expert testimony as to the time of death was uncertain and that Wiggins was aware of this fact. Judge Hinkel, as trier of fact, concluded that the claimed newly discovered evidence would not have produced a different result. In this regard, we note that, at the sentencing hearing, Dr. Korell's testimony was that Ms. Lacs could have been dead twenty-four to forty-eight hours prior to 9 p.m. on September 17 when she was photographed in the bathtub, or even earlier on that day. Thus, her revised opinion, if introduced at the trial, would have actually buttressed the State's case. We hold that Judge Hinkel did not abuse his discretion in denying the new trial motion.

■ Nor is there merit in Wiggins's claim that he should be granted a new trial because Dr. Korell's changing testimony rendered the trial fundamentally unfair. As the trial court noted, and the record indicates, medical testimony regarding time of death is fraught with uncertainty. Wiggins was aware that Dr. Korell changed her opinion once prior to the trial, and the defense had ample time to, and did, secure its own qualified expert testimony on this matter. As the ambivalence of the State's expert witness was known to the defense, her opinion at the sentencing hearing did not deprive Wiggins of a fair trial. Accordingly, we find no merit in this argument.

## V.

Wiggins argues that he cannot be sentenced to death because under Maryland Code (1987 Repl.Vol.), Art. 27, § 413(e)(1), the State failed to prove beyond a reasonable doubt that he was a principal in the first degree. In response, the State maintains that the evidence does not disclose the existence of a second person in the commission of the crimes, and therefore the jury properly concluded that Wiggins was a principal in the first degree.

■ As we said in *Stebbing v. State*, 299 Md. 331, 371, 473 A.2d 903 (1984), eligibility for the death sentence is confined to persons convicted of first degree murder as a principal in the first degree, namely, by one who actually commits a crime, either by his own hand, or by an inanimate agency, or by an innocent human agent. *Johnson v. State*, 303 Md. 487, 510, 495 A.2d 1 (1985).[1]

■ As already indicated, there was evidence which showed that Wiggins was present near the victim's apartment at the approximate time of the crimes. The manner of the victim's death was homicide, and the circumstances plainly demonstrated that the murder was premeditated. Under the circumstances disclosed in the evidence, Wiggins's possession of the victim's property shortly after she was robbed and murdered support an inference that he was the perpetrator of both the robbery and the murder.

There was no evidence that Wiggins was seen in company with another person at the time of the offenses. In this regard, Wiggins's employer indicated that he had released Wiggins from work at approximately 4:45 p.m., and that Wiggins returned some twenty minutes later, reporting that he had moved some sheetrock. As before, Wiggins was alone. Shortly thereafter, when Wiggins arrived at his girlfriend's home, driving the victim's car, he was again alone. There was no other individual present, according to the evidence, during the three-day period over which Wiggins and his girlfriend used the victim's credit cards to acquire various items of property.

We have considered Wiggins's arguments suggesting the presence of a second perpetrator because of the unidentified fingerprints found at the crime scene, as well as the Ryder Rental Truck hat that was found on the floor just inside the apartment door. As to the unidentified fingerprints, the State's failure, after investigation, to ascertain the identity

---

1. A statutory exception to the perpetrator requirement in death penalty cases is the provision that one who employs another to kill is also a first degree principal. *See* Art. 27, § 413(d)(7) and § 413(e)(1).

of these prints does not support the existence of a second participant. In this regard, the fingerprint experts were uncertain that the unidentified prints were not those of the victim, inasmuch as the prints taken from her body were of such poor quality. We view this evidence as wholly inconclusive and not supportive of a reasonable hypothesis that Wiggins may have acted in concert with another person.

As to the hat, the police examined it for hair and fibers but found only a few small lint fibers on its inside rim. The police took the hat to two stores to see if they sold that type of hat and found that neither did. At most, this evidence showed that the State, after investigation, was unable to prove that Wiggins owned the hat or that it belonged to someone else. This evidence does not support a reasonable hypothesis that another individual was present in the victim's apartment at the time of the crimes and that it was that other person, and not himself, who actually killed the victim. Accordingly, we find no error in the jury's finding that Wiggins was a principal in the first degree.

## VI.

Prior to sentencing, the State moved *in limine* to exclude evidence of its offer of a life sentence in exchange for a guilty plea. Wiggins had indicated an intention to introduce evidence of this offer during the sentencing hearing. The court ruled that while the offer, if admitted in evidence, would "mitigate[ ] in favor of the defendant," it was not admissible before the sentencing authority as it would seriously cripple the plea negotiation process in capital sentencing prosecutions.

Wiggins argues that the State's plea offer was properly admissible as mitigating evidence because, under *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the sentencing authority in capital cases must be permitted to consider any relevant mitigating factor, *i.e.*, anything that might serve as a basis for a sentence less than death. Specifically, Wiggins says that the State's offer, for what-

ever reason it was made, demonstrated its belief that a life sentence was appropriate in the case and had this been known to the sentencing jury it would not have imposed the death sentence.

In *Lockett*, 438 U.S. at 605, 98 S.Ct. at 2965, the Supreme Court held that

"the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."

(Emphasis in original; footnotes omitted.) Nothing in *Lockett*, the Court said, "limits the traditional authority of the court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Id.* at 605, n. 12, 98 S.Ct. at 2965, n. 12, quoted in *Johnson, supra,* 303 Md. at 527–28, 495 A.2d 1.

We have said that the appropriateness of sentences other than death may be considered by the sentencer as a mitigating circumstance in a capital prosecution. *See Hunt v. State,* 321 Md. 387, 404, 583 A.2d 218 (1990); *Doering v. State,* 313 Md. 384, 545 A.2d 1281 (1988); *Harris v. State,* 312 Md. 225, 539 A.2d 637 (1988). In *Hunt,* the defendant did not seek timely admission of evidence of his sentence for a handgun offense, and his request to reopen his case to offer it was denied by the trial judge. We held that the evidence would have been admissible in Hunt's case-in-chief, as evidence that "would aid the jury in assessing the legal and practical effect of a sentence less than death," 321 Md. at 404, 583 A.2d 218, but that the trial judge did not abuse his discretion in denying the request to reopen. In *Harris,* we held that evidence of the sentences imposed on the defendant for a related robbery offense, where the robbery was the statutory aggravating factor in a capital sentencing proceeding, was admissible. We reasoned that the sentenc-

er might consider, as a mitigating factor, the fact that the defendant had already been appropriately sentenced for that crime. In *Doering*, we held that a defendant in a capital sentencing proceeding may introduce relevant and competent information regarding his eligibility for parole in the event a life sentence is imposed. We explained that the sentencer, in seeking to determine the appropriateness of a life sentence, would be aided by information correctly describing the legal and practical effects of such a sentence, and that the existence of an appropriate alternative sentence may be considered as a relevant mitigating circumstance. *Doering*, 313 Md. at 412, 545 A.2d 1281. In these three cases, the factors with the potential to mitigate were related to the actual amount of time the defendant was likely to spend in prison in the event that the jury elected to impose a life sentence; consequently, they constituted relevant information for the jury to consider in determining the appropriate disposition.

Evidence of a plea offer, on the other hand, is not an appropriate factor to aid the jury in making its determination. As Wiggins concedes, the State may have sought a guilty plea to avoid the possibility of an acquittal in a case which involved largely circumstantial evidence. This prosecutorial concern would not, therefore, necessarily indicate that the State considered a life sentence to be the appropriate punishment for Wiggins's crimes. In other words, as the State suggests, its plea offer did not reflect on either the crime or the character of the defendant; rather, it resulted after the State evaluated the strength of its case and the concern that it had that the jury might not return a guilty verdict. Thus, the evidence of the plea offer did not bear on the defendant's character, prior record, or the circumstances of the crime, and was not relevant mitigating evidence. *See Calhoun v. State*, 297 Md. 563, 468 A.2d 45 (1983).

## VII.

Wiggins next contends that the trial court erred in excluding from the consideration of the sentencing jury, as

relevant mitigating evidence, a three-volume collection of documents detailing potentially capital cases where a sentence less than death was imposed. He draws attention to Art. 27, § 414(e)(4), which requires this Court in every case where the death sentence has been imposed to compare it to those imposed "in similar cases" to insure that it is not excessive or disproportionate, "considering both the crime and the defendant." Wiggins claims that sentence proportionality is an appropriate consideration for the sentencing authority as well, and that the proffered evidence should have been admitted for its consideration. He claims that, lacking this information, the sentencing jury did not have relevant information to make its sentencing decision—information which, he says, is traditionally relevant in determining the appropriate sentence and which would have assisted a jury in determining the weight to be given to aggravating factors in weighing them against mitigating circumstances. In this regard, Wiggins says that had the jury known of the frequency with which life imprisonment is imposed in murder cases of a more extreme nature than his own, it might well have determined to return a sentence less than death.

In *White v. State,* 322 Md. 738, 589 A.2d 969 (1991), we noted that proportionality review in capital sentencing cases under Art. 27, § 414(e)(4) requires the review to be conducted by this Court and not by the sentencing authority. We further noted that there is no federal constitutional requirement of proportionality review in death penalty cases, citing *Pulley v. Harris,* 465 U.S. 37, 50–51, 104 S.Ct. 871, 879–880, 79 L.Ed.2d 29 (1984). While we recognized that evidence proffered by a defendant to establish the existence of a mitigating circumstance should be generously viewed by the sentencer, we also said that mitigating circumstances are "defendant specific" and "incident specific" and that ordinarily the findings regarding another person do not in any way tend to establish a material fact beneficial to an entirely different individual. *White, supra,* 322 Md. at 750, 589 A.2d 969; *Johnson v. State, supra,* 303 Md. at 528–29, 495 A.2d 1. For like reasons, we also find no

merit in Wiggins's further argument that the trial court erred in excluding from evidence a law review article chronicling a study which, according to the author, uncovered 350 cases in which a miscarriage of justice occurred in a potentially capital case.

## VIII.

Wiggins maintains that his right of allocution before the sentencing jury was unduly restricted. Particularly, he argues that after all of the evidence had been presented to the sentencing authority, but before the court had given its instruction to the jury, he sought to show, in allocution before the jury, that he had been offered a life sentence in exchange for a guilty plea but had rejected the State's offer. In denying the request, the court noted that allocution "is considered evidence in the case for the purposes of the jury determining what the sentence ought to be ... although that evidence is not given ... under oath." The court restricted Wiggins's right of allocution for the same reasons which caused it to exclude the same evidence at the sentencing hearing.

Wiggins argues that under *Harris v. State*, 306 Md. 344, 509 A.2d 120 (1986), he should have been permitted to allocute as he had requested. He claims that the substance of the intended allocution was relevant because under *Harris, id.* at 351, 509 A.2d 120, "allocution, unlike closing argument, is not limited to the record in the case, inferences from material in the record, and matters of common human experience."

Although the custom predates the Maryland Rules, the right of allocution is now provided to a defendant in a capital case by Maryland Rule 4–343(d). The Rule provides, in pertinent part, that "[b]efore sentence is determined, the court shall afford the defendant the opportunity, personally and through counsel, to make a statement." In *Harris*, 306 Md. at 359, 509 A.2d 120, we said that a defendant who timely asserts his right to allocute, and who provides an

acceptable proffer, must be afforded a fair opportunity to exercise this right. We did not, however, circumscribe the broad and traditional discretion of trial judges over the conduct of a criminal trial; rather, we recognized that the trial court could, in its discretion, curtail "allocution that is irrelevant or unreasonably protracted." *Id.* at 359, 509 A.2d 120. We conclude, for reasons earlier stated, that the State's offer of a plea agreement was not a proper matter of consideration for the jury in deciding the appropriateness of a death sentence.

## IX.

Wiggins next urges that the trial court erred in denying his motion for a bifurcated sentencing hearing. In this regard, he moved that the sentencing proceeding be bifurcated by the court so that the jury could first decide whether he was a principal in the first degree and, if that issue was found in the affirmative, a separate proceeding should then be held to determine whether the aggravating circumstances outweighed the mitigating circumstances and death was the appropriate penalty. According to Wiggins, this is a fair and equitable solution to problems "which arise from deciding, at the sentencing proceeding, both the issue of first degree principal and the appropriate penalty." Without bifurcation, Wiggins argues that "there will be not only overlays and confusion but also the inevitable result that the jury, in deciding whether the defendant is eligible for the death penalty, will consider evidence prejudicial to the issue of guilt or innocence as a first degree principal, *i.e.*, evidence the admission of which at a trial would be reversible error." Wiggins maintains that neither the death penalty statute, nor the implementing rules of this Court, prohibit bifurcation and that, in fact, they are consistent with bifurcation of the sentencing proceeding.

In response, the State maintains that, in effect, Wiggins seeks to have the sentencing jury first reconsider his guilt "under the guise of a principal in the first degree determi-

nation (after the court had convicted him of murder) without the jury's proper role of 'sentencer' being evident."

According to the State, nothing in the capital sentencing statute, Art. 27, § 413(a), requires a separate sentencing proceeding to determine the punishment, nor is it required by the statute or the federal constitution that any component part of the sentencing determination be determined in a separate proceeding. *See McGautha v. California*, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971). The State points out that Maryland Rule 4–343(e) prescribes the form for jury deliberation of sentence in a capital case. That form places before the jury, simultaneously, the issues of principal in the first degree, mitigating and aggravating circumstances, and the ultimate determination. Rule 4–343(f) delineates circumstances under which the form, in less than its entirety, may be submitted to the jury. Nothing in the rule, however, mandates a bifurcated hearing and we perceive no error in the trial court's refusal to order bifurcation. *See Hunt v. State, supra; State v. Colvin*, 314 Md. 1, 548 A.2d 506 (1988). But even assuming, *arguendo*, the existence of inherent discretion in the trial court to bifurcate the proceeding, no abuse of discretion would have resulted from the denial of the bifurcation request.

## X.

Wiggins next claims that the trial judge, during the sentencing hearing, committed reversible error when he admitted evidence relating to a T.V. Guide book found in the victim's apartment at the time her body was discovered. Specifically, he claims that testimony by a police officer described a T.V. Guide magazine with markings on all of the pages through the date that the victim was last seen alive, but not thereafter. Wiggins asserts that this testimony was irrelevant and prejudicial. He argues that it had no probative value, because no witness testified regarding the victim's habit of marking T.V. Guide magazines. There-

fore, he says, it is not known when these marks were made, why they were made, or even by whom they were made.

In *State v. Joynes*, 314 Md. 113, 119, 549 A.2d 380 (1988), we applied the test which governs the admissibility of evidence in a criminal case. We noted that there are two important components of relevant evidence: materiality and probative value. Materiality looks to the relation between the proposition for which the evidence is offered and the issues in the case. Probative value is the tendency of evidence to establish the proposition that it is offered to prove. Evidence which is not probative of the proposition at which it is directed is irrelevant. *Id.* at 119, 549 A.2d 380. Thus, to be of probative value, evidence must only have a tendency to prove the fact at issue; it need not establish the fact conclusively or be beyond doubt.

A daily pattern of marking each day's television programs was reflected in the magazine, and it ceased as of the time the victim was last seen alive. While it is theoretically possible that someone other than the victim made the marks, or that they were made randomly, or were all made on one day, these possibilities do not circumscribe the relevance and admissibility of the evidence. The victim lived alone, and the factfinder could infer that the markings were made on a day-to-day basis, in a contemporaneous fashion, consistent with the victim's daily television viewing selections. We think that the date on which the markings ceased had a tendency to prove that the victim died on September 15 and, therefore, the evidence was properly admitted.

## XI.

Wiggins further complains that testimony by one of the victim's friends, Mary Elgert, constituted victim impact evidence which was inadmissible under *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). Specifically, Ms. Elgert testified that the victim was "a very

happy-go-lucky person" who was "always thinking of something interesting."

We think it clear that Ms. Elgert's testimony could in no event be deemed victim impact evidence under the Court's decision in *Booth;* it did not describe the impact of the crime on the victim's family, or the family members' opinions, and characterizations of the crime and the defendants. *See Mills v. State,* 310 Md. 33, 72–73, n. 14, 527 A.2d 3 (1987), *rev'd on other grounds,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). The even more compelling answer to Wiggins's contention is that in *Payne v. Tennessee,* 501 U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the Supreme Court reversed its earlier holding in *Booth,* concluding that the Eighth Amendment does not prohibit a jury from considering, at a capital sentencing hearing, "victim impact" evidence relating to a victim's personal characteristics, and the emotional impact of the murder on the victim's family. Accordingly, there was no error in admitting Ms. Elgert's testimony in evidence.

## XII.

Relying upon Art. 27, § 414(e)(4), Wiggins attacks his death sentence on proportionality grounds. He claims that the sentence was excessive and disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, and therefore violated the statute. Moreover, he argues that his sentence contravened Articles 16 and 25 of the Maryland Declaration of Rights, and the 8th and 14th amendments to the federal constitution.

In *Tichnell v. State,* 287 Md. 695, 739, 415 A.2d 830 (1980), we said that a death sentence in a murder case "may be affirmed only if juries throughout the State have imposed the death penalty for that kind of offense." The purpose of proportionality review under § 414(e)(4) is substantially to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury, so that if the time comes when juries generally do not impose the

death sentence in a certain kind of murder case, this Court can vacate the death sentence. *Trimble v. State,* 300 Md. 387, 429, 478 A.2d 1143 (1984).

Wiggins says that juries throughout the State have not imposed the death penalty in murder cases involving the single aggravating factor of murder in the course of a robbery. He invites our attention to a compilation of detailed sentencing information in 198 cases of robbery-murder committed since July 1, 1978, involving allegedly similar factual situations, where the death penalty was either not sought or was sought but not imposed.

■ We have considered the cases that Wiggins presents for comparison purposes. The compilation is much like that considered by us in *Collins v. State,* 318 Md. 269, 298–300, 568 A.2d 1 (1990), another capital prosecution based on murder committed in the course of a robbery. There, we noted that similarities and differences were evident in the respective cases presented for our review; but we perceived no useful purpose in setting them out seriatim, with some particular facts included about each case and each defendant, citing *Foster v. State,* 304 Md. 439, 484, 499 A.2d 1236 (1985), *reconsideration denied,* 305 Md. 306, 503 A.2d 1326, *cert. den.,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986). Suffice it to say that our analysis of the "similar cases" formulation of § 414(e)(4) leads us to conclude that the death sentence has been imposed in a significant number of cases where the aggravating circumstance was that the murder was committed during the course of a robbery. *See Collins, supra; Foster v. State, supra; Johnson v. State, supra; Colvin v. State,* 299 Md. 88, 472 A.2d 953 (1984). *See also White v. State, supra.*

Wiggins was found to be a first degree principal in the murder-drowning of a defenseless elderly woman in her home during the perpetration of a robbery. From the physical evidence at the scene of the crime, it is evident that the victim struggled with Wiggins before being immersed in her bathtub to suffer a brutal death. Even though the

prime mitigating circumstance was Wiggins's lack of a prior criminal record, we conclude that the death penalty in this case was neither excessive nor disproportionate. Nor was it aberrant, arbitrary, capricious, or freakish; and it was not imposed under the influence of passion, prejudice, or because of the existence of an arbitrary factor. Contrary to Wiggins's suggestion, society has not rejected capital punishment for the type of murder-robbery committed in this case, considering both the crime and the defendants in light of similar cases.

## XIII.

 Wiggins contends that the Maryland death penalty statute is unconstitutional because he was required to prove mitigating factors by a preponderance of the evidence. There is no merit to this contention. *See Walton v. Arizona,* 497 U.S. ——, 110 S.Ct. 3047, 3055, 111 L.Ed.2d 511 (1990); *Collins, supra,* 318 Md. at 296, 568 A.2d 1; *Calhoun v. State,* 306 Md. 692, 739–40, 511 A.2d 461 (1986), *cert. denied,* 480 U.S. 910, 107 S.Ct. 1339, 94 L.Ed.2d 528 (1987).

 Wiggins further contends that the Maryland statute is constitutionally defective because, with respect to those mitigating circumstances not enumerated in the statute, he was required to convince the sentencing authority, by a preponderance of the evidence, not only that the circumstance exists but that it was mitigating in nature. There is no merit to this contention. *See Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990); *Franklin v. Lynaugh,* 487 U.S. 164, 188, 108 S.Ct. 2320, 2334–35, 101 L.Ed.2d 155 (1988); *Foster v. State,* 304 Md. 439, 476–80, 499 A.2d 1236 (1985).

 Wiggins next maintains that the Maryland statute is unconstitutional because the death sentence may be imposed if the aggravating circumstances outweigh the mitigating circumstances by only a preponderance of the evidence. *There is no merit to this contention. See Collins,*

*supra,* 318 Md. at 296, 568 A.2d 1; *Tichnell, supra,* 287 Md. at 731–32, 415 A.2d 830.

## XIV.

Finally, Wiggins contends that the trial court erred in imposing two eighteen-month concurrent sentences for his two theft convictions. He maintains that these convictions should have merged into his robbery conviction on principles of merger, *i.e.,* that the robbery convictions involved theft of the same property charged in the theft counts of the indictment. The State agreed, pointing out that the thefts were lesser included offenses of the robbery. Accordingly, we shall vacate the theft convictions on counts four and five of the indictments.

JUDGMENT AFFIRMED, EXCEPT AS TO THEFT COUNTS 4 AND 5 OF THE INDICTMENT, AS TO WHICH THE JUDGMENTS ARE VACATED.

ELDRIDGE, Judge, dissenting:

In my view, the evidence at the sentencing hearing was insufficient for the jury to find, beyond a reasonable doubt, that Kevin Wiggins was a principal in the first degree in the murder of Florence Lacs. Consequently, I dissent from the judgment affirming the imposition of the death penalty.

When reviewing the sufficiency of the evidence, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 318–319, 99 S.Ct. 2781, 2788–2789, 61 L.Ed.2d 560, 573 (1979); *Tichnell v. State,* 287 Md. 695, 717, 415 A.2d 830, 842 (1980). The finding that Wiggins was a principal in the first degree, however, rests entirely on circumstantial evidence. "[A] conviction upon circumstantial evidence *alone* is not to be sustained unless the circumstances are inconsistent with any reasonable hypothesis of innocence." *West v. State,* 312 Md. 197, 211–212, 539 A.2d 231, 238 (1988).

*See also Wilson v. State,* 319 Md. 530, 535–537, 573 A.2d 831, 833–834 (1990). The evidence presented at the sentencing hearing would permit a reasonable trier of fact to hypothesize that Wiggins was not a principal in the first degree.

Under the Maryland statutory scheme, the proof concerning guilt required at a capital sentencing hearing is different from the proof required at the guilt or innocence stage of the trial. At the guilt or innocence stage, the State must prove beyond a reasonable doubt that the defendant is guilty of first degree murder. The defendant may be guilty of first degree murder, of course, even though he is a principal in the second degree, an accessory, or guilty under the felony murder doctrine. At the sentencing stage more is required, as the State must show beyond a reasonable doubt that the defendant was the actual perpetrator of the murder. He must be a principal in the first degree. Maryland Code (1957, 1987 Repl.Vol., 1991 Cum.Supp), Art. 27, § 413(e)(1); Maryland Rule 4–343(e); *Johnson v. State,* 303 Md. 487, 510, 495 A.2d 1, 12 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986); *Stebbing v. State,* 299 Md. 331, 371, 473 A.2d 903, 923, *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984).[1]

In this case, the evidence produced at the sentencing hearing differed in some respects from the evidence presented at the guilt or innocence stage of trial. For example, the sentencing jury did not hear any testimony from Wiggins's cellmates. Thus, the jury could not take into account the testimony given at the earlier stage of the trial concerning conversations Wiggins allegedly had about the circumstances of the murder with these cellmates. Moreover, the testimony of Wiggins's employer at the sentencing hearing differed somewhat from his testimony at the guilt or innocence stage. In addition, the significance of some of the evidence at the sentencing hearing was

---

1. There is one exception to the requirement that the defendant be a principal in the first degree, but it is not relevant here.

different from its significance at the earlier stage. This is true of the evidence pointing to the involvement of someone other than Wiggins in the robbery and murder.

The State's theory was that Wiggins committed the robbery and murder between the time he was initially dismissed from work on Thursday and the time he returned to inform his employer that he had moved some sheetrock. The State's case at sentencing was based on Wiggins's presence near the victim's apartment on Thursday afternoon at approximately 5:00 p.m. and on the fact that Wiggins and his girlfriend used the victim's credit cards and car on Thursday night. While this evidence may have been sufficient to establish that Wiggins was involved in the robbery of Ms. Lacs, it was not sufficient to show, beyond a reasonable doubt, that Wiggins was the actual perpetrator of the murder.

The State produced no direct evidence supporting its theory that the victim died at approximately 5:00 p.m. on Thursday. The expert testimony with regard to time of death advanced by the State was more consistent with the defendant's theory that the victim had died on Friday evening. The Death Certificate, as originally filled out by the State's expert, fixed the approximate time of death as Friday evening. At the sentencing hearing, each of the three expert witnesses estimated that the maximum range for a time of death extended back to approximately 9:00 p.m. on Thursday, which was after Wiggins went shopping with the victim's credit cards.

The weakness of the State's theory with regard to time of death was further undermined by the testimony of Edith Vassar who reiterated that she had spoken to the victim over the telephone on Friday morning.[2] Ms. Vassar testi-

---

**2.** Ms. Vassar also testified that she had received an anonymous telephone call and that the caller told her that she must be mistaken about the day of the call. At the sentencing hearing, however, Ms. Vassar asserted that she was not mistaken.

fied that they discussed the luncheon which she and Ms. Lacs had attended on Thursday afternoon.

Furthermore, two of the girls whose testimony placed Wiggins at the scene testified that Wiggins had spoken to Ms. Lacs about some sheetrock at 5:00 p.m. or 5:30 p.m. The girls testified that Wiggins left the building ahead of them. Wiggins checked in with his employer at approximately 5:05 p.m. According to the employer, he had been gone for twenty minutes.[3] The subcontractor's office was about five minutes away from the victim's apartment. This time sequence does not give Wiggins much time to ransack the victim's apartment, to fill her bath tub with water, to drown her, and to go over the entire apartment wiping off his fingerprints.

Other evidence which tends to weaken an already fragile case of circumstantial evidence is the lack of consistency in the testimony concerning Ms. Lacs's clothing by those who came in contact with her on Thursday, which, according to the State, was the last day of her life. Mary Elgert, one of Ms. Lacs's friends, stated that Ms. Lacs was wearing a light blue skirt and a white blouse Thursday afternoon. Elizabeth Lane, another friend, told the police on Saturday that Ms. Lacs was last seen wearing a red dress as late as 4:00 p.m. on Thursday. One of the girls in the hallway, Chentell Greenwood, testified that at approximately 5:00 p.m. on Thursday, Ms. Lacs had on a red skirt and a white blouse. The pictures of the victim submitted to the jury show that the skirt was dark blue. The color of the skirt was characterized by the defendant's attorney as teal and by Detective Crabbs as green. This conflicting testimony cannot support

---

3. Wiggins's employer testified at sentencing that Wiggins was dismissed from work at 4:45 p.m. on Thursday. The employer also testified that Wiggins returned twenty minutes later to inform his boss that he had moved some sheetrock to the front of the building. At the guilt or innocence stage of the trial, as pointed out in the majority opinion, the employer testified that Wiggins had been gone for twenty-five to thirty-five minutes.

the inference that Ms. Lacs died on Thursday because she was found in Thursday's clothes.

Finally, evidence was discovered which tended to point to the participation of another person in the robbery/murder. Several fingerprints that did not belong to Wiggins were found in the apartment. The places where these prints were found are relevant. They were discovered on the front door arch, the archway wall of the kitchen, and on the doorjamb leading to the bathroom. Others were found on a soap box on the kitchen table which, along with other cleaning items, had been moved from their usual places in the kitchen. In addition to the fingerprints, the investigation also discovered a man's hat bearing a Ryder Rental Truck emblem at the scene. Police were unable to tie this hat to Wiggins, and none of the witnesses who testified that they had seen Wiggins that day testified that Wiggins had been wearing this hat.

When viewed in isolation, the fingerprints and the hat perhaps may not, as the majority states, "support a reasonable hypothesis that another individual was present in the victim's apartment...." When this evidence is added to an already weak circumstantial case, however, the combination leads to the conclusion that the evidence at the sentencing hearing was not sufficient to establish, beyond a reasonable doubt, that Wiggins was the principal in the first degree.

In addition to the insufficiency of the evidence per se, there is another ground warranting a reversal of the death sentence. This Court is required by Art. 27, § 414(e)(4), to conduct a proportionality review. Under the present death penalty statute, this Court has never upheld a death sentence on evidence as weak as that introduced in this case. In the numerous cases where we have upheld the death sentence, there was little question that the defendant committed the murder as a principal in the first degree. Evidence which supported these findings included a confession by the defendant, *Stebbing v. State, supra;* eyewitness testimony to the incident, *Gilliam v. State,* 320 Md. 637, 579 A.2d 744 (1990), *cert. denied,* — U.S. —, 111 S.Ct.

1024, 112 L.Ed.2d 1106 (1991); *Huffington v. State*, 304 Md. 559, 500 A.2d 272 (1985), *cert. denied*, 478 U.S. 1023, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986); *White v. State*, 300 Md. 719, 481 A.2d 201 (1984), *cert. denied*, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 837 (1985); and fingerprints of the defendant at the scene coupled with the defendant's possession of the victim's property, *Colvin v. State*, 299 Md. 88, 472 A.2d 953, *cert. denied*, 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984). Where the defendant's participation in the murder as a principal in the first degree is based upon a very weak case of circumstantial evidence, a sentence of death is disproportionate.

I would vacate the death sentence and remand for the imposition of a life sentence.

Judge Cole has authorized me to state that he concurs with the views expressed herein.