630 A.2d 725

Eugene COLVIN–EL

v.

STATE of Maryland.

No. 104, Sept. Term, 1992.

Court of Appeals of Maryland.

Sept. 16, 1993.

146

Michael R. Malloy and Michael R. Braudes, Asst. Public Defenders; (Stephen E. Harris, Public Defender), all on brief, Baltimore, for appellant.

Gwynn X. Kinsey, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen.), on brief, Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, KARWACKI and ROBERT M. BELL and CHARLES E. ORTH, Jr. (Retired, Specially Assigned), JJ.

RODOWSKY, Judge.

This case is a direct appeal from a death sentence imposed by a jury at a resentencing hearing. We shall affirm.

The appellant, Eugene Colvin-el, was convicted in the Circuit Court for Anne Arundel County, in a prosecution removed

from Baltimore County, of first degree murder, robbery with a deadly weapon, and daytime housebreaking. That jury sentenced him to death. The trial court did not impose sentence on the additional convictions. Nor did the court consider enhanced punishment for multiple crimes of violence, although the State had notified Colvin-el, through counsel, that it was invoking those provisions as well. We affirmed the judgment. *Colvin v. State,* 299 Md. 88, 472 A.2d 953 *(Colvin-el I), cert. denied,* 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984).

In post-conviction proceedings the trial court left the guilty verdicts unaffected, but vacated the death sentence. We affirmed because of *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and because, under *Raiford v. State,* 296 Md. 289, 462 A.2d 1192 (1983), the use of "juvenile" convictions against Colvin-el violated equal protection. *State v. Colvin,* 314 Md. 1, 548 A.2d 506 (1988) *(Colvin-el II).* Colvin-el brought a second petition for post-conviction relief that the circuit court denied after trial. Colvin-el's application for leave to appeal from that denial was dismissed by this Court without hearing, and the circuit court judgment was vacated for lack of jurisdiction, because the Post–Conviction Procedure Act does not apply to one simply awaiting sentence. Resentencing pursuant to the mandate in *Colvin-el II* was held and resulted in a jury-imposed death sentence from which this appeal is taken.

On September 9, 1980, between approximately 1:00 and 2:30 in the afternoon Lena Buchman, aged eighty-two, was murdered in her daughter's home at 6806 Cherokee Drive in the Pikesville area of Baltimore County. Mrs. Buchman, a resident of Florida, had flown to Baltimore that morning to visit her daughter, Mrs. Marjorie Surell,[1] and her family. When the murder occurred both Mr. and Mrs. Surell were at work. Mrs. Buchman was last seen alive, alone in the house, by her

---

1. The transcript of the trial on guilt or innocence and of the original sentencing proceeding spelled the victim's daughter's name as "Sorrell." That spelling was used in *Colvin-el I* and *Colvin-el II.* The transcript of the resentencing uses the spelling employed here.

granddaughter, Susan Rubin, *nee* Surell, (Mrs. Rubin), who left shortly after 1:00 p.m., following lunch.

Mrs. Buchman's body was found at approximately 2:30 p.m. by a neighbor who entered the house through the front doorway. The inner wooden door was standing open and the outer screen door was unlocked. Mrs. Buchman's body lay in a hallway that extended from the front door to the kitchen of the split level home. The victim had been stabbed approximately twenty-eight times with a serrated knife ordinarily kept in the Surells' kitchen.

At the subject resentencing hearing, the legal issues were whether Colvin-el was a principal in the first degree to the murder of Mrs. Buchman, whether that murder was committed while Colvin-el was committing or attempting to commit robbery, whether there were any mitigating circumstances found by any juror, and whether the aggravating circumstances outweighed the mitigating circumstances. Md.Code (1957, 1992 Repl.Vol.), Art. 27, § 413 and Maryland Rule 4–343. The State's proof as to the first two issues basically presented the investigation of the crimes.

The principal clues were latent fingerprints, particularly very clear fingerprints on pieces of glass from a broken pane in the door at the rear of the basement. The police concluded that that door was the point of entry. These pieces of glass were found stacked on the steps of the stairwell leading to the rear basement door, which was partially below ground level. The lock in the knob of the door was unlocked, and chain locks on the door frame were found unhooked and dangling. The inference was that the intruder had picked the pieces of glass out of the window after breaking it and before reaching through to unlock the door. The door, which opened inwardly, was closed, but an ironing board that was kept leaning against the inside of the door was found flat on the floor. The investigating officers' report observed that the basement door " 'could be opened, but only approx. 4 inches as there was a white metal storage cabinet on the inside of the door. No

other signs of forced entry could be found.' " *Colvin-el II,* 314 Md. at 9, 548 A.2d at 510.

Excluding "elimination" fingerprints, *i.e.,* those of family and friends, none of the latent prints found inside or outside of the Surell house initially were positively identified. Although Colvin-el had multiple prior convictions in Maryland, the capacity was apparently then unavailable to compare specific, unidentified latent fingerprints against a database of identified fingerprints. Over the months following the murder, the investigating police officers requested the Baltimore County Police Department latent fingerprint examiners to compare the latent prints from the Surell home against copies of the fingerprints of dozens and dozens of known persons who were suspected in any way of being connected to housebreakings in the northwest Baltimore region. This approach had no success. The Baltimore County fingerprint examiners were also routinely comparing the latent fingerprints from the Surell home with identified fingerprints with which they might be working in ordinary course. Further, many pieces of jewelry owned by the Surells were taken from their bedroom during the breaking and entering. That jewelry had recently been appraised, and the appraisal descriptions were circulated to businesses where one or more items of the jewelry might be presented for sale. That approach had no success.

In order to increase the number of identified fingerprints to which the latent fingerprints from the Surell home could be compared, in October 1980 Detective Michael R. Parks of the Baltimore County police enlisted the cooperation of a fingerprint examiner with the Baltimore City Police Department, Sharon Talmadge (Talmadge). Talmadge agreed to compare a photograph of the latent prints from the Surell home with identified prints with which she might be working in ordinary course. After comparing the copy against the fingerprints of approximately 625 people, Talmadge, on January 13, 1981, matched the right thumb of the latent prints with an inked print submitted to her by Baltimore City Detective Martin Colleran. The inked print bore the identification of Colvin-el.

Detective Colleran had arrested Colvin-el on January 8, 1981.[2] At the time of arrest Colvin-el was carrying his age of majority card, ID No. C–415–237–765–777, in the name of Eugene Sherman Colvin, 615 Brice Street, Baltimore, Maryland 21217. The card is a form of identification issued by the Maryland Motor Vehicle Administration to persons who are not licensed operators of motor vehicles. It contains a face-on photograph of the head of the person identified. Detective Colleran took custody of the card and also submitted Colvin-el's fingerprints for comparison by the Baltimore City Crime Lab.

When Talmadge matched fingerprints identified to Colvin-el with the latent prints from the Buchman murder scene, she advised Detective Parks. Colvin-el was arrested that day on the charge of murdering Mrs. Buchman, and he was processed by the Baltimore County Police Department. Processing included taking a full set of fingerprints that were personally rolled by Detective Parks. Identification cards for each hand were prepared and signed by Colvin-el and by Detective Parks. In addition to a full set of fingerprints and palm prints, the cards contain a description of Colvin-el, who is five foot seven inches in height. He weighed 135 pounds when arrested.

Thereafter Detective Parks, looking for Colvin-el's name, examined the daily transaction sheets submitted by pawnshop operators in Baltimore City to the Baltimore City Police Department. This review led the investigators to Northwestern Loan Company at 1701 Pennsylvania Avenue in Baltimore City. Ledger and pawn ticket records of Northwestern Loan Company record that two watches were pawned there on September 17, 1980, by Eugene Sherman Colvin-el of 615 Brice Street, Zone 17. In transaction 14717, the object pawned was a man's pocket watch that was still in the possession of Northwestern Loan Company when the investi-

2. The warrant under which Colvin-el was arrested charged a breaking and entering on December 2, 1980, in the Roland Park section of Baltimore City. *Colvin-el II*, 314 Md. at 11, 548 A.2d at 511.

gators presented themselves on January 27, 1981. That watch, confiscated by the police, was one of the items taken from the Surell home. The person who pawned the watch was an African–American male who presented age of majority card ID No. C–415–237–765–777. The clerk who handled the transaction, Armand Kessler, testified that in every instance of a transaction in which a picture identification was presented he compared the picture to the person presenting the identification. In transaction 14661, handled by a different clerk, Colvin-el pawned a man's wristwatch that was confiscated by the police and identified at trial as an item taken from the Surell home.

In the defendant's case the trial court accorded considerable liberty in allowing evidence of sightings of persons considered by the beholders to be "suspicious." This evidence ranged well beyond the 6600 block of Cherokee Drive on the afternoon of September 9, 1980. The defense also produced evidence relating to police activity in investigating persons suspected of, or arrested for, breaking and entering, whose identified fingerprints were furnished for comparison with the latent prints from the Surell home in the course of the investigation.[3]

In his allocution Colvin-el included the statement, "I did not go into the Surell's house, rob, hurt or kill Ms. Buchman." The testimony, exhibits, and the balance of Colvin-el's allocution concentrated on mitigating circumstances and the weighing process.

The resentencing jury found that the State had proven that Colvin-el was a principal in the first degree to the murder and that it was committed while perpetrating robbery. No statutory mitigating factors were found. Under the "catch-all"

---

3. No issue is presented on this appeal involving the exclusion by the trial court of any evidence in these categories. Nevertheless, we remind circuit judges that the classification under Maryland Rule 4–343 of first degree principalship as a sentencing issue is not an invitation for a jury in a resentencing to redetermine guilt or innocence of murder in the first degree.

question on the form for nonstatutory mitigating factors the jury unanimously found that the "[e]vidence persuades that the Defendant did not premeditate this murder." One or more, but fewer than all twelve, of the jurors also found the following:

"1. Evidence persuades that the Defendant is not likely to be a threat to others in prison society.

"2. Evidence persuades that the Defendant has some qualities that could be socially constructive and beneficial within the prison society."

The jury unanimously found that the State had proven by a preponderance of the evidence that the aggravating circumstance outweighed the mitigating circumstances, and the jury unanimously determined the sentence to be death.

In this opinion we shall consider the issues raised in the order in which the events involved in the issues occurred at trial, as opposed to the order of presentation of issues in Colvin-el's brief. The exception is Colvin-el's ninth issue, alleging insufficiency of the evidence to prove first degree principalship, which we consider immediately below.

## I

The insufficiency argument made in the appellant's brief has two aspects: (A) Colvin-el's presence at the murder was not proved; or (B) even if Colvin-el's presence was proved, his being the actual killer was not proved.

## A

In the opening statement for the defense, counsel agreed with the State that the evidence would show that Colvin-el's fingerprints were on the glass from the window in the rear basement door and that the evidence would show that Colvin-el pawned two of the seventeen items of jewelry taken from the Surells' home. Before us Colvin-el contends that "there was no direct evidence linking Appellant to the crime scene at or around the time the offense was perpetrated." Brief of Appellant at 45. This argument overlooks the direct evidence

from Mrs. Rubin that the downstairs of the Surell home was in normal condition when she went there after lunching with Mrs. Buchman and before leaving at about 1:10 p.m. The jury properly could infer that, if the breaking and entry had occurred on an earlier occasion than the murder, Mrs. Rubin would have noticed the ironing board lying flat on the floor as opposed to its normal position, upright against the inside of the basement door, or would have noticed the broken pane in the door.

Further, in *Colvin-el I,* we rejected the argument that the evidence was insufficient to show Colvin-el's criminal agency in the murder and robbery. Based on a review of the evidence, 299 Md. at 111, 472 A.2d at 964, we concluded "that the circumstances surrounding the fingerprints found on the glass broken from the basement door tend to exclude the hypothesis that the print was impressed at a time other than that of the crime." *Id.* In *Colvin-el II,* we said that the fingerprint evidence made it "fanciful to suggest" that an adequate defense counsel would have created a reasonable doubt based on Colvin-el's being either a finder of lost property or a receiver of stolen goods. 314 Md. at 14, 548 A.2d at 512.

## B

Alternatively Colvin-el points to evidence "suggesting the participation of someone other than Appellant." Brief of Appellant at 45. A few, non-elimination, latent fingerprints that were obtained within the house could not be matched with those of Colvin-el or any other identified person. Of these, one fingerprint could also be excluded as definitely not that of Colvin-el. That fingerprint was on a single piece of paper that was recovered by the police from a small notepad that was in Mrs. Buchman's large, canvas handbag which was found on the counter in the Surells' kitchen. The police found the handbag open. On the top of the inside of the handbag was an open wallet. Attached as part of the outside of the wallet was an open change purse. The only money in the wallet consisted of a few coins in the change purse.

The piece of paper, measuring approximately three and one-half inches by six inches, has writing on one side, divisible into three categories. The top section is a shopping list reading, "Tegrin, Mylanta, Kaopectate [and] tape." The second section is a note saying in part, "give to Alberta," with the balance not decipherable but possibly reading, "promise cat paid." Mrs. Surell identified the handwriting on these two portions of the note as that of her mother, Mrs. Buchman, who had a friend in Florida named Alberta. The third section of the note was a name, Edith Kellerman. That handwriting was not the handwriting of Mrs. Buchman, and Mrs. Surell did not know who Edith Kellerman was.

Colvin-el's argument to the jury was that the unidentified fingerprint indicates the presence of some other person in the kitchen where the knife was obtained with which Mrs. Buchman was murdered. That argument failed with the jury, and it also fails to render the State's evidence legally insufficient as to first degree principalship. A reasonable juror could conclude that the unidentified fingerprint was left by the person who wrote the name Edith Kellerman. In any event, the jury was not compelled to find that, either before or after killing Mrs. Buchman, the person who opened the handbag, wallet, and change purse also went through her notebook and was sufficiently fascinated with the medicines that Mrs. Buchman took that that person impressed a clear fingerprint on the slip of paper while reading it.

Because the jury could find that no one was in the house at the time of the murder other than the victim and Colvin-el, the jury could reasonably conclude that the murder of Mrs. Buchman by Colvin-el, as previously established, was committed by him as a principal in the first degree.

## C

The dissent in this case takes a somewhat different tack from that of defense counsel. In addition to emphasizing the absence of physical evidence demonstrating Colvin-el's presence inside of the Surells' home, the dissent marshals the

arguments made by defense counsel to the jury for rejecting the investigating officer's conclusion as to the point of entry. From this the dissent pronounces the evidence legally insufficient to establish that Colvin-el was a principal in the first degree. Whether the police correctly reconstructed the means of entry was relevant for the jury's general assessment of the reliability of the police investigation, but that debate does not foreclose the jury from finding that Colvin-el was the first degree principal. There is no dispute that entry was gained and that Mrs. Buchman was murdered in the course of the robbery inside of the house. Rejecting the conclusion drawn by the police as to the point of entry does nothing to place one or more persons, other than Colvin-el, in the home.

From the standpoint of inferring the ultimate fact of first degree principalship, this case is not substantially distinguishable from *Wiggins v. State*, 324 Md. 551, 597 A.2d 1359 (1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992). In that case the murder victim was a seventy-seven year old woman who lived alone in an apartment house unit. She was last seen alive late on Thursday afternoon. Her body was found sometime after 2:00 p.m. on Saturday afternoon in the bathtub of her apartment. She had been murdered by drowning. The medical examiner could not opine on the maximum length of time that the victim had been dead. The defendant had been employed as a day laborer for a contractor who was working on the apartment house. A child, age twelve at the time of trial, the victim, and the defendant were together in the hall outside of the victim's apartment at approximately 4:30 or 5:00 p.m. on the Thursday afternoon, attempting to lock the door to the apartment where the child lived. At approximately 5:00 or 5:30 p.m. that Thursday the same child heard the victim and the defendant converse briefly, apparently while they were in the hall. This witness's identification of the defendant was made at a pretrial photographic array, but the witness was unable to identify the defendant at trial.

The contractor testified that he had released the defendant from work between 4:00 and 4:45 p.m. that Thursday and that

he saw the defendant outside of the apartment house approximately twenty-five to thirty-five minutes later. The defendant explained that he had been performing a task—one that the contractor considered could have been done in two minutes.

The evidence also disclosed that on that Thursday evening, at about 7:45 p.m., the defendant drove the victim's automobile to the home of the defendant's girlfriend, and that they went shopping using the victim's credit cards. Use of the car and credit cards was repeated the next day, and on Saturday the defendant pawned an item of jewelry belonging to the victim.

In *Wiggins* there was no evidence directly placing the defendant in the victim's apartment.[4] We held that the trier of fact could conclude that the defendant was the principal in the first degree, despite the circumstantial nature of much of the evidence, and despite the testimony of a friend of the victim who said that she spoke to the victim by telephone on Friday morning. Here, in the absence of any evidence clearly pointing to participation in the murder and robbery by some other person or persons, in addition to Colvin-el, the proof is sufficient to support a jury finding that Colvin-el alone murdered and robbed Mrs. Buchman.

## II

In its opening statement the State told the jury that certain evidence about Colvin-el's prior convictions would be introduced, including the fact that, when Colvin-el murdered Mrs. Buchman, he had been out on parole for about one year. The prosecutor said that the confinement from which Colvin-el was paroled was "for committing a very similar crime where he did not injure a woman." The defense objected, invoking *Scott v. State*, 297 Md. 235, 465 A.2d 1126 (1983), which

---

4. *Wiggins* was tried to the court, and the trial judge made specific findings of fact. Two witnesses for the State were persons who were confined with the defendant. Each of them testified to a separate occasion on which the defendant admitted the murder and robbery. The trial judge found that this testimony was not credible. Thus, these admissions were excluded from the legal sufficiency calculus.

interpreted Art. 27, § 413(c)(1)(iii). That statute includes among evidence admissible in a capital sentencing proceeding "[e]vidence of any prior criminal convictions, pleas of guilty or nolo contendere, or the absence of such prior convictions or pleas, to the same extent admissible in other sentencing procedures." *Scott* interpreted § 413(c)(1)(iii) to preclude "inflammatory detailed evidence of the underlying facts and circumstances surrounding unrelated crimes." 297 Md. at 247, 465 A.2d at 1133.

The prosecutor's statement at issue here is not detailed. Nor is it inflammatory. It could hardly be inflammatory when Colvin-el, while testifying at the original sentencing proceeding, invoked the same comparison, with details, to show that he was *not* a violent person. He said:

"In 1972 they speak of the robbery with a deadly weapon. I didn't hurt the lady. My intention was not to hurt her and I told her this."

He further testified:

"I've never harmed anyone. She said I throwed her on the floor and tied her up. I did *not* throw her on the floor. I told her to get on the floor and she got on the floor. I said, 'Miss, I will not harm you. I just want to keep you from calling the police.' I did not have to explain this to her. I am not violent!"

There was no error.

### III

In the State's case in chief Mrs. Rubin testified as a fact witness for the State and was cross-examined. When the trial judge inquired if the State would examine on redirect, the prosecutor replied:

"Nothing further, Judge. I would just put on the record that I've spoken to Miss ... Mrs. Rubin, and she has indicated that she doesn't feel capable of presenting ... victim impact testimony. That's why we haven't done it."

Defense counsel objected to the prosecutor's testifying. At a bench conference the prosecutor apologized for an "inappropriate" statement. The defense argued for a mistrial, but the motion was denied. In response to the trial court's invitation, the defense requested an instruction directing the jury to disregard the statement. After debating whether Mrs. Rubin could remain in the courtroom, the bench conference ended. The court then directed the jurors that they were "to disregard" the prosecutor's "final comments."

The prosecutor's statement was clearly improper, as the trial court ruled, but the court did not abuse its discretion in denying the motion for mistrial.

"Where the motion [for mistrial] is denied and the trial judge gives a curative instruction, we must determine whether the evidence was so prejudicial that it denied the defendant a fair trial; that is, whether the damage in the form of prejudice to the defendant transcended the curative effect of the instruction."

*Medical Mut. Liab. Ins. Soc'y v. Evans,* 330 Md. 1, 19, 622 A.2d 103, 112 (1993) (quotations omitted); *see also Rainville v. State,* 328 Md. 398, 408, 614 A.2d 949, 953–54 (1992); *State v. Hawkins,* 326 Md. 270, 277, 604 A.2d 489, 493 (1992).

Here, the effect of Mrs. Buchman's death on Mrs. Rubin was not admissible through the prosecutor, but it was admissible through Mrs. Rubin who could have been cross-examined, assuming defense counsel considered cross-examination tactically advisable. If the State had put a proper question to Mrs. Rubin seeking to elicit that effect, a response that she was too distressed to discuss her feelings would have been admissible. *See Payne v. Tennessee,* —— U.S. ——, ——, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720, 736 (1991). Further, in evaluating any prejudice and the efficacy of the curative instruction, the trial court could consider that the jury had already heard victim impact testimony from Mrs. Surell. That testimony included the statement: "I can't eat honeydew melon because that was the last thing that ... my daughter came to visit my mother, and they had honeydew melon that

day. And that was the knife probably that was used to kill her." Under these circumstances we see no abuse of discretion in denying the motion for mistrial.

## IV

■ During the State's presentation in chief, Colvin-el objected to testimony from fingerprint examiner Talmadge of Baltimore City that the copy of the latent fingerprints left with her by Baltimore County Detective Parks matched the fingerprints furnished to her by Baltimore City Detective Colleran on a fingerprint card for Colvin-el. The ground was that it would be hearsay for Talmadge to say that the latent prints were those of Colvin-el, because Talmadge had no personal knowledge whether the fingerprints on the card bearing Colvin-el's name actually were those of Colvin-el. The State disclaimed any attempt to prove through Talmadge that the latent prints from the Surell home were those of Colvin-el, but the State asserted that the purpose of the proof was to explain how the investigation focused on Colvin-el, so that the name on the fingerprint card was admissible through Talmadge for that purpose. The court overruled the objection and offered to give the jury a limiting instruction, if the defense so requested, but no express request was made.

The evidence was admissible for the limited purpose indicated by the State, and the defense waived any right to a limiting instruction.

■ Further, even if there were error, it was harmless beyond a reasonable doubt. The latent fingerprints found at the Surell home were identified at trial to be those of Colvin-el by James Simms (Simms), formerly a latent print examiner for the Baltimore County Police Department and currently the instructor in the use of the statewide, computerized, fingerprint identification system. Simms compared the latent fingerprints to a set of inked fingerprints, rolled from the fingers of Colvin-el by Detective Parks, who testified in person to having done so.

Colvin-el nevertheless contends that the error in admitting Talmadge's testimony improperly bolstered the evidence given by Simms, so that there is prejudice. The argument cannot be a general proposition of law; otherwise erroneously admitted evidence could never be considered simply cumulative to a fact properly proven by other evidence. *See Tichnell v. State,* 287 Md. 695, 716, 415 A.2d 830, 841 (1980). Nor is there prejudice under the particular circumstances here, where defense counsel acknowledged in opening statement that the evidence would show that Colvin-el's fingerprints were on the broken glass.

## V

■ At the conclusion of the State's case in chief it introduced documentary evidence consisting of the presentence investigation report (PSI) and certified copies of court records evidencing Colvin-el's prior convictions for crimes of violence and other offenses. Included among these exhibits was a copy of a portion of the docket sheet from the file in the subject prosecution reflecting the jury verdict in Colvin-el's original guilt or innocence trial for the murder of Mrs. Buchman. The exhibit read, in relevant part: "Finding: Guilty 1st degree Murder; Guilty Felony Murder; Guilty Robbery with a deadly weapon; Guilty Daytime Breaking and Entering." The PSI, which had been updated to May 1992, included the same information.

During the trial court's orientation instructions to the jury and again when the exhibits were offered, defense counsel took the position that the jury should not be advised of any guilty verdicts in the instant prosecution, other than for first degree murder, because the State had the obligation at a resentencing hearing to prove again that there was an aggravating factor to the murder. The objection is correct as a legal proposition. *See Hunt v. State,* 321 Md. 387, 445–46, 583 A.2d 218, 246–47 (1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991); *Colvin-el II,* 314 Md. at 18–19, 548 A.2d at 513–14; *cf. Tichnell v. State,* 290 Md. 43, 63, 427 A.2d 991, 1001 (1981). In practical operation under the circum-

stances here, however, the error is harmless beyond a reasonable doubt.

In Part I hereof we explained why there was legally sufficient evidence to find that Colvin-el was the principal in the first degree to the murder of Mrs. Buchman, and how the defense argument to the jury sought to put a second person in the house through the unidentified fingerprint on the slip of paper from the notepad that was in the handbag of Mrs. Buchman. Even if the jury had accepted Colvin-el's argument that he was not the actual killer, it would not have had any effect on the overwhelming evidence that Colvin-el was, at least, an aider and abettor in the robbery.

Under all of the evidence the murder and robbery were part of one criminal episode that occurred between 1:10 p.m. and 2:30 p.m. on September 9, 1980. At the resentencing Colvin-el stood guilty of first degree murder, a fact of which the jury was necessarily advised. Thus the resentencing jury knew that a prior jury had already found that Colvin-el was at the scene of the murder and robbery at the time of the murder and robbery. The only *disputed* factual issue that the resentencing jury had to decide, bearing on the offenses within the criminal episode, was whether Colvin-el acted alone or whether he aided and abetted another in the murder. The trial court instructed the jury to consider first the issue of first degree principalship in the murder, and the jury found that Colvin-el was the first degree principal. But, even if the jury had found that someone else had actually killed Mrs. Buchman, that would not have disturbed the verdict that Colvin-el was guilty of murder, at least as an aider and abettor, and therefore guilty, at least as an aider and abettor, in the contemporaneous robbery.

Clearly there was no factual dispute about the robbery. In summing up and after arguing that Colvin-el was not a principal in the first degree to murder, defense counsel acknowledged to the jury that the aggravating factor of robbery was proven. Defense counsel said:

"At some point on September the 9th and either with or without a weapon, there was some property taken from Ms. Buchman by force or threat of force. And that does constitute robbery. I believe the State has fairly generated the evidence and proved to you beyond a reasonable doubt that a robbery did, in fact, occur. And I believe that you should mark the aggravating factor [of robbery] as 'proven.'"

## VI

■ When the PSI was introduced as State's Exhibit 46, Colvin-el objected to the portion of the section headed "MENTAL HEALTH" referring to a 1975 report by Dr. Neulander describing Colvin-el as "prone to lying." The entire paragraph containing the challenged portion of the report is set forth below as it appears in State's Exhibit 46 (ellipsis in original).

"MENTAL HEALTH:

"During his last incarceration, Colvin received psychological evaluation on at least two occasions. A report dated June 11, 1975 by Dr. Neulander describe[s] Colvin as being a 'very guarded and evasive person who is fearful of revealing his true characteristics and is prone to lying . . . in order to present the best impression of himself.' The defendant was also examined by Robert D. Matthews, Psychologist, in July, 1978. Dr. Matthews found the defendant to be a very passive aggressive person at times. He also notes that Colvin 'can develop some paranoid posture' when pressured and can be unpredictable at times. Dr. Matthews concludes that the defendant was in need of proper controls and needed to be closely monitored. If this was not done, Dr. Matthews relates that the defendant's behavior may easily regress."

Lack of relevance was specified as the ground for the objection, in the sense that the proffered evidence did not bear on any issue in the hearing. In this respect Colvin-el cites *Bohnert v. State,* 312 Md. 266, 539 A.2d 657 (1988), for the proposition that, even if Dr. Neulander had been called as a witness, he could not opine upon the truthfulness of an account

by another witness. Colvin-el also submits to this Court that the reference to Dr. Neulander's report is too remote to be relevant at the resentencing in May 1992.[5]

A PSI, excluding any recommendation as to sentence, is presumptively admissible under Art. 27, § 413(c)(1)(iv). *Hunt v. State*, 321 Md. at 431–32, 583 A.2d at 239, explained the presumption:

"[R]eliable information contained in a presentence investigation report, which is of probative value and relevant to sentencing, ordinarily is admissible provided the defendant is accorded a fair opportunity to rebut any statements."

---

5. Colvin-el further suggests to this Court that the prosecutor "deleted a key phrase in order to render the passage [from Dr. Neulander's original report] more prejudicial to Appellant." Brief of Appellant at 37. This squabble involves the ellipsis in the paragraph from State Exhibit 46, quoted in the text above.

State Exhibit 46 consists of an initial presentence investigation and its updates. The original PSI was completed February 20, 1981, for the District Court of Maryland in Baltimore City in a prosecution in which Colvin-el was charged with unauthorized use of an automobile. It is that portion of the PSI exhibit which includes the section on "MENTAL HEALTH." The basic report was updated April 3, 1981, for the Criminal Court of Baltimore for sentencing on the daytime housebreaking charge that had led to Colvin-el's arrest by Detective Colleran on January 8, 1981. The second update was completed May 19, 1992, for the subject resentencing.

In the defendant's case Colvin-el called an expert on adjustment to prison life, Dr. Robert Johnson. In cross-examining Dr. Johnson the prosecutor, without reading that section aloud, referred the witness to the excerpt from Dr. Neulander's report in the PSI. Following an objection, a bench conference ensued at which the trial judge apparently found "the psychological evaluation inside the file dated 6/11/75." The trial judge then read part of that evaluation into the record, but out of the hearing of the jury. The sentence in controversy, in part, reads that Colvin-el " 'is prone to lying or at least giving himself the benefit of the doubt in order to present the best impression of himself.' "

After noting that the Neulander excerpt continued to be part of the PSI in evidence, the trial court would not require Dr. Johnson to read that segment of the report aloud to the jury as the State had requested. Defense counsel did not seek to have State's Exhibit 46 modified to insert the words omitted and indicated by the ellipsis in the PSI as introduced.

Thus, when the prosecutor read from the PSI in the State's summation, the prosecutor did not delete a key phrase from the exhibit in evidence.

Although this Court has not addressed directly the admissibility of the mental health portion of a PSI, we have frequently upheld the admission of PSI information over an objection that the information was not relevant. *See, e.g., id.* at 430–32, 583 A.2d at 239 (holding admissible reports of prison infractions in the PSI); *Collins v. State,* 318 Md. 269, 294–95, 568 A.2d 1, 13–14 (holding admissible juvenile record and prison infraction report in PSI), *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3296, 111 L.Ed.2d 805 (1990); *Grandison v. State,* 305 Md. 685, 757–58, 506 A.2d 580, 616–17 (holding admissible explanatory statements in PSI about the defendant's federal convictions), *cert. denied,* 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986); *Huffington v. State,* 304 Md. 559, 577–78, 500 A.2d 272, 281 (1985) (holding admissible reports of prison infractions in the PSI), *cert. denied,* 478 U.S. 1023, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986). The mental health report on Colvin-el, including the statement by Dr. Neulander, was similarly relevant and probative with regard to the sentencing decision. Quoting *Bartholomey v. State,* 267 Md. 175, 193–94, 297 A.2d 696, 706 (1972), *Huffington* discussed the admissibility of information in a PSI, stating:

" '[T]o aid the sentencing [body] in fairly and intelligently exercising the discretion vested in [it], the procedural policy of the State encourages [the] consider[ation of] information concerning the convicted person's reputation, past offenses, health, habits, mental and moral propensities, social background and any other matters that a [sentencing body] ought to have before [it] in determining the sentence that should be imposed.' "

304 Md. at 577, 500 A.2d at 281 (emphasis added). Given the importance that the convicted person's mental and physical health and mental and moral propensities play in the sentencing determination, the mental health report contained in the PSI was germane.

Nor was the contested portion of the "MENTAL HEALTH" section of the PSI too remote. Dr. Robert Johnson, an expert called by the defense, opined that Colvin-el "is highly unlikely to pose a danger to others in the prison

community." In addition to interviews with Colvin-el, that opinion was based upon Dr. Johnson's review of Colvin-el's file "in some detail," and upon an analysis of "his interviews and what others said about him and what his file revealed to the general body of knowledge that exists on lifers." Dr. Neulander's report was one of the records that Dr. Johnson considered, but he said that it did not alter his opinion. Dr. Johnson explained the extent of the significance that he attributed to the Neulander report.

"[T]hat sort of assertion is fairly common in institutional files and it has to do with the lack of trust that exists between inmates and the larger institution, particularly in a testing situation. I think it simply cautions you that you have to establish some trust and you also have to verify when possible. And I view that as just a caveat of any good interviewer. Any good interviewer goes into the situation knowing that you have to first of all establish a situation of trust, and then secondly you've gotta let people speak openly, then you have to follow up and verify when you can."

Thus, Dr. Johnson gave the excerpt from Dr. Neulander contemporaneous relevance to the issues in this case, and Dr. Johnson also explained why the excerpt was included in the "MENTAL HEALTH" segment of the PSI in the first instance.

## VII

Three issues presented by Colvin-el involve evidentiary rulings during the testimony of Dr. Johnson, the defense's expert on prisoner behavior. Dr. Johnson holds a Ph.D. in criminal justice. He studies the behavior of incarcerated individuals, particularly "lifers." On direct examination, Dr. Johnson testified that, over time, lifers adjust to prison life. They consider their cells their homes and their cellblocks their neighborhoods. Lifers get involved in work and education. Specifically, Dr. Johnson testified that Colvin-el conformed to that pattern. The witness noted the absence of violent infractions during the past eleven years and explained, as situation-

al, recent infractions involving drugs, including hard drugs. It was the stress of the then forthcoming resentencing hearing, Dr. Johnson said, that caused Colvin-el to seek an escape through drugs.

### A

Dr. Johnson concluded his testimony on direct by opining that Colvin-el "is highly unlikely to pose a danger to others in the prison community. He has not in the past and I see no reason why he will in the future."

On cross-examination the prosecutor established that Dr. Johnson had reviewed Colvin-el's entire base file. The colloquy set out below followed.

"[Prosecutor] You indicated that the defendant had no infractions for violence. Correct?

"[Dr. Johnson] Correct.

"Q That, I take it, doesn't mean the same thing as having an infraction for possession of a weapon?

"A No—

"[Defense Counsel] Objection, your Honor."

A bench conference ensued. Defense counsel said that twenty years earlier, while Colvin-el was incarcerated on another offense, prison officials had found a penknife in his cell. The ground specified for the objection was that the inquiry was beyond the scope of the direct. The prosecution countered that Dr. Johnson had used the base file, in which the knife infraction was listed, when rendering his opinion. The court overruled the objection and the following ensued:

"[Prosecutor] ... So an inmate merely in possession of a weapon would not by you necessarily be considered violen[t]. Is that correct?

"[Dr. Johnson] Would not necessarily be considered violen[t], but I should stress that ... during his eleven years in this penitentiary he had no such incident. That's an incident from a prior confinement.

"Q Oh, you were aware of that?

"A I was aware of that."

Dr. Johnson said that the incident, as reported in the file, "was rather ambiguously described and it was unclear what the weapon was. It appears to have been something on the order of a penknife which Mr. Colvin-el claimed he used to clip his nails." Dr. Johnson explained that he gave the infraction little weight in evaluating Colvin-el's adjustment as a "lifer," because Colvin-el had no similar infractions during his current confinement.

 Appellate review of an evidentiary ruling, when a specific objection was made, is limited to the ground assigned. *Calhoun v. State,* 297 Md. 563, 601, 468 A.2d 45, 62 (1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984). The rule invoked by the objection is that "cross-examination ordinarily may only be used to explore the subject matter covered by the witness in his direct examination and for impeachment purposes." *Thomas v. State,* 301 Md. 294, 308, 483 A.2d 6, 13 (1984), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985). Here the State was entitled to explore the basis for Dr. Johnson's opinion, and the State was entitled to suggest through its examination that Dr. Johnson was selective in what the witness considered to be important in the base file. "Wide latitude must be given a cross-examiner in exploring a witness' bias or motivation in testifying." *Bruce v. State,* 318 Md. 706, 727, 569 A.2d 1254, 1265 (1990). What Dr. Johnson considered to be relevant in forming his opinion does not define the scope of legal relevance. In evaluating Dr. Johnson's opinion the jury was entitled to consider the persuasiveness of his reasons for giving little or no weight to the knife incident, as well as to the drug incidents.

In this Court the emphasis in Colvin-el's argument in support of the objection is on remoteness. The evidence was not remote, for the reasons given above and given in Part VI hereof concerning the admission of the mental health history in the PSI.

B

During the cross-examination of Dr. Johnson, Colvin-el unsuccessfully made and renewed a motion for mistrial. The circumstances are set out below.

On direct examination Dr. Johnson had recognized that "[s]ometimes people say to themselves, if you give a man life in prison he has nothing to lose." Dr. Johnson's studies, and his description of the studies by others, concerning "lifers" contradicted that impression held by some people. On cross-examination the State elicited that Dr. Johnson had been a researcher in a major study spanning four years and involving hundreds of inmates, of whom "lifers" were one subsample. When asked how "lifers" were defined for that study, Dr. Johnson said they were "people serving twenty or more years as a reasonable expectation [and l]ong-termers were those serving ten or more years as a reasonable expectation." The cross-examination continued as follows:

"Q Okay. So someone serving twenty years know[s] they're gonna get out sooner or later, right, unless they get killed in jail?

"A Uh-huh.

"Q All right. Someone serving life knows they're gonna get out probably?

"[DEFENSE COUNSEL]: Objection."

At the ensuing bench conference Colvin-el moved for a mistrial, contending that the State was conveying the impression that Colvin-el would be released. It appears that, at that stage of the resentencing, the trial court had not yet advised counsel how it would instruct the jury with respect to Colvin-el's eligibility, based on qualifying convictions already in evidence, for life imprisonment without parole pursuant to Art. 27, § 643B(b). The State maintained that, having just learned that "lifers" meant twenty years or more, it was entitled to find out what Dr. Johnson's "parameters" were. The court sustained the objection, deferred advising what the jury instruction would be, and reserved ruling on the motion for mistrial.

In renewed cross-examination the State developed that "lifer" is a term that varies to some extent by state, but "a fair cutting point that is used in the general field is twenty years." When asked whether one sentenced to twenty years would behave as the typical "lifer" previously described by Dr. Johnson, the witness said:

> "It depends in part on the sentencing structure. If you think you'll be paroled in six years then you may not react that way."

A few questions later the prosecutor began a question, "So when you talk about twenty years or more . . . that inmate knows without a doubt. . . ." The defense again objected and moved for mistrial. In colloquy at the bench the trial court commented to defense counsel, "I think you've created—at least in my mind you've created part of the box that you're fighting against now." The trial court again deferred ruling on the instruction to the jury and reserved on the motion for mistrial. Later, when denying a motion for new trial, the court also denied the motion for mistrial.

In this Court Colvin-el recognizes that the way in which "lifer" was defined for purposes of studies reinforcing Dr. Johnson's opinion was a proper subject of cross-examination. Colvin-el emphasizes, however, the question, "Someone serving life knows they're gonna get out probably?". In context, the question simply borrowed the definition of "lifer" furnished by Dr. Johnson.

Colvin-el contends that the prejudice lies in the possibility that the jury interpreted the comment to apply to the life sentence that the jury had the option to impose at the resentencing hearing. There can be no prejudice because the trial court, at the close of the evidence, instructed the jury that the trial court would impose life without parole if the jury returned a verdict of life imprisonment.[6]

---

**6.** The relevant part of the instruction is set forth below:

"If your determination is that Mr. Colvin-el is to be sentenced to life imprisonment, he shall spend the balance of his natural life in a penal institution.

## C

On redirect examination of Dr. Johnson one of the four questions put to him by defense counsel was the following:

"Q When this period of crisis is over, can you predict how many infractions [Colvin-el] will have following the period of crisis?"

The State lodged a general objection which the court sustained. Defense counsel made no proffer of proof. The question is bad in form. Obviously, no one can predict "how many" infractions Colvin-el would have. There was no error in sustaining the objection.

At oral argument in this Court counsel for Colvin-el admitted that "it would be absurd to suggest that [Dr. Johnson] was going to say 7.2 or 15 or 5. What he was going to say . . . most likely was, 'Not many.'" The argument confirms that the question was bad in form. Even if we were to accept the appellate proffer, the error, if any, would be harmless. The appellate proffer reiterates the substance of Dr. Johnson's previous testimony.

## VIII

Colvin-el also argues two exceptions taken to the jury instructions, one relating to allocution and the other to the length of jury deliberations.

## A

 Set forth below is the instruction on Colvin-el's right of allocution.

---

"However, if you impose a life sentence in this case, I shall tell you that there is evidence that has been presented, which would permit me to require that the life sentence would be served without the possibility of parole. Life imprisonment without the possibility of parole means that the imprisonment would be for the natural life of Mr. Colvin-el, and that he would not be eligible for parole consideration, and that he cannot be granted parole at any time during his natural life.

"I instruct you that if you return a sentence of life imprisonment, that I intend to impose that life sentence without the possibility of parole."

"In a sentencing proceeding such as this, Mr. Colvin-el will have a right, which we call a right of allocution, which means that he will have an opportunity to address you. . . .

"In making your decision on whether the appropriate sentence is life imprisonment or death, you must consider the testimony from the various witnesses who have appeared and testified from the witness stand, the physical evidence and exhibits which have been admitted into evidence and which will be available to you during your deliberations, the stipulations which the attorneys have entered into and which are evidence for your consideration, as well as Mr. Colvin-el's statements and allocution to you in mitigation of punishment.

"The truthfulness and accuracy of the matters which Mr. Colvin-el may relate to you and the weight you give to his statements are for your determination and your decision. *But you may not disregard his statements in allocution merely because they are not under oath and he will not be subject to the penalties of perjury or cross-examination by the State's prosecutor as have been other witnesses.*"

(Emphasis added). Relying on *Harris v. State,* 312 Md. 225, 539 A.2d 637 (1988), Colvin-el argues that the italicized language rendered his allocution a "second-class form of proof." Brief of Appellant at 34.

In *Harris* we reaffirmed that it is permissible for a prosecutor to contrast testimony with allocution and to urge rejection of the allocution in part based on the absence of an oath and of cross-examination. 312 Md. at 254, 539 A.2d at 651; *see also Booth v. State,* 306 Md. 172, 199, 507 A.2d 1098, 1112 (1986), *vacated on other grounds,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). The error in *Harris,* which is not present here, was that the court had told the jury "to decide the case only on . . . evidence," but then had instructed that the defendant's "statement in allocution is not evidence or testimony." 312 Md. at 254, 539 A.2d at 651.

We said in *Harris:*

"*Booth* makes it plain that the credibility of what is said at allocution may be questioned, but *Booth* makes it equally plain that statements made at allocution may not be disregarded merely because they are not under oath."

*Id.* at 254–55, 539 A.2d at 651.

The instruction given in this case was proper. *See Hunt v. State,* 321 Md. at 439–41, 583 A.2d at 241–42.

### B

■■■ Colvin-el proposed, and the trial court refused to give, the following instruction:

"If for any reason you are unable within a reasonable degree of time to reach a unanimous judgment as to the balancing required by Section IV of the form, I will sentence Eugene Colvin-el to life without parole."

In *Bruce v. State,* 328 Md. 594, 621–22, 616 A.2d 392, 406 (1992), we again rejected the notion that this instruction must be given. *See also Oken v. State,* 327 Md. 628, 642–43, 612 A.2d 258, 265 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993); *Booth v. State,* 327 Md. 142, 153–54, 608 A.2d 162, 167, *cert. denied,* —— U.S. ——, 113 S.Ct. 500, 121 L.Ed.2d 437 (1992); *Grandison v. State,* 305 Md. at 771, 506 A.2d at 623; *Calhoun v. State,* 297 Md. at 593–95, 468 A.2d at 58–60. We again reject it.

### IX

■■■ The State's closing argument to the jury has generated two issues.

### A

The first of the disputed statements is the following:

"[Prosecutor]: I think that most people would stand up here and say, you know, the Surells and the Buchmans have a right to demand revenge. And if we were living a hundred years ago and they demanded it, they would probably get it, ladies and gentlemen, but our system of justice

doesn't work that way. They can't have it. But you know what, ladies and gentlemen, they don't want it. They don't want revenge, and they have never wanted revenge.

"All they're asking—

"[Defense Counsel]: Your Honor, that's not in evidence. It's not arguable.

"Court: Move on to the next area."

After the argument, Colvin-el unsuccessfully moved for a mistrial, based on the foregoing.

Colvin-el argues that this statement was calculated to inflame the jury by invoking a revenge motive for a death sentence and that the comment contains matter not in evidence—none of the victim's family testified to a lack of desire for retribution.

Colvin-el refers to *Hunt v. State*, 321 Md. at 435, 583 A.2d at 241, for the proposition that the prosecutor should not "make remarks calculated to inflame the jury and prejudice the defendant." Brief of Appellant at 30. In *Hunt* the prosecutor, referring to the defendant's allocution, had stated " 'it is worthless, it is trash, it is an attempt to manipulate you . . ., it is insulting, it is demeaning, . . . written by God knows who. . . .' " 321 Md. at 434, 583 A.2d at 241. We held in *Hunt* that the argument there came close to, but did not cross, the line between the wide latitude allowed in presenting closing argument and the impermissible. *Id.* at 435–36, 583 A.2d at 241–42. From the standpoint of the words used to communicate the idea presented in this case, the argument here is not presented in an inflammatory manner.

Further, if any juror at the resentencing accepted as fact the matter not in evidence, it could hardly be prejudicial to Colvin-el. Under that assumption the credulous juror would believe that no one in Mrs. Buchman's family wanted her death avenged.

Colvin-el's basic argument is that improper prejudice lies in injecting indirectly into the argument an appeal to the jurors to give the victim's family revenge. But a prosecutor is not

prohibited from doing indirectly that which might be done directly. One of the social policies underlying the enactment and continuation of the death penalty is vengeance or retribution. Whether a particular jury should be reminded of that policy is a tactical decision for the State. If the policy is injected into the State's argument, the State runs the risk that the argument, if improperly handled, will result in a mistrial for prosecutorial misconduct, or in the vacating of a sentence. Here, the prosecutor gave the jury a somewhat subtle and certainly low key reminder of one of the reasons why they faced the duty of applying a death penalty law. Simply to mention the policy is not inflammatory in the mistrial-inducing sense of the term.

In *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the opinion announcing judgment explained that retribution and deterrence underlie the death penalty, saying:

"In part, capital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs.

" 'The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they "deserve," then there are sown the seeds of anarchy—of self-help, vigilante justice, and lynch law.' *Furman v. Georgia*, 408 U.S. [238,] 308, 92 S.Ct. [2726], 2761[, 33 L.Ed.2d 346, 389 (1972) ] (Stewart, J., concurring).

" 'Retribution is no longer the dominant objective of the criminal law,' *Williams v. New York*, 337 U.S. 241, 248, 69 S.Ct. 1079, 1084, 93 L.Ed. 1337[, 1343] (1949), but neither is it a forbidden objective nor one inconsistent with our respect for the dignity of men. *Furman v. Georgia*, 408 U.S. at 394–395, 92 S.Ct. at 2806–2807[, 33 L.Ed.2d at 438–39]

(Burger, C.J., dissenting); *id.* at 452–454, 92 S.Ct. at 2835–2836[, 33 L.Ed.2d at 472–74] (Powell, J., dissenting); *Powell v. Texas*, 392 U.S. [514,] 531, 535–536, 88 S.Ct. [2145,] 2153, 2155–2156[, 20 L.Ed.2d 1254, 1266–67, 1269–70 (1968) ] (plurality opinion)."

*Id.* at 183–84, 96 S.Ct. at 2930, 49 L.Ed.2d at 880 (footnote omitted).

In *Trimble v. State*, 300 Md. 387, 425, 478 A.2d 1143, 1162–63 (1984), *cert. denied*, 469 U.S. 1230, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1985), this Court quoted approvingly the passage from *Gregg* set forth above, thereby recognizing that retribution and deterrence underlie the Maryland death penalty statute. *Trimble* considered a challenge on cruel and unusual punishment grounds to imposition of the death penalty for a rape-murder committed by a person four months shy of his eighteenth birthday. Rejecting the challenge under the facts in that case, Judge Cole, speaking for the Court, concluded the operative principle to be that "[i]n extreme cases, the benign goals of the juvenile system are subordinated to the more broad-based and immediate interest in retribution." *Id.* at 427, 478 A.2d at 1163.

Retribution is not a *per se* unmentionable in a death penalty case. The manner in which the subject was handled in the case before us was not impermissible.

### B

In the rebuttal portion of the State's closing argument, the prosecutor commented on the testimony of Detective Sturgeon, one of the investigators at the murder scene, who placed the point of entry at the rear basement door.

"[Prosecutor]: Number one, do you think that Detective Sturgeon, a seasoned investigator, . . . would have said the door only opened four inches? To this day, he's sorry he ever used that term. I guarantee you.

"[Defense Counsel]: Objection, Your Honor.

"[Prosecutor]: Because he said to you—

"[Defense Counsel]: That's not in evidence.

"Court: This is argument.

"[Prosecutor]: Because he said to you he didn't measure it."

Colvin-el argues that a key issue was whether he was the first degree principal, and that it was important how far the door could open. Construing the comment as the prosecutor's personal guarantee that Sturgeon "had not meant to say in his original report that the door opened only about four inches," Brief of Appellant at 33, Colvin-el concludes that the comment was prejudicial.

Colvin-el misconstrues the remark which, against the background of this case, simply infers Sturgeon's great annoyance with himself for having failed to measure the opening.

In the original written report of investigation, Sturgeon said that the basement door could open "approx." four inches. No point was made of this at the original trial or in the *Colvin-el I* appeal. On the appeal from post-conviction proceedings we noted that one of the arguments advanced to support the alleged ineffectiveness of Colvin-el's original defense counsel was that "Det[ective] Sturgeon was not cross-examined concerning the apparent impossibility that the basement door was the point of entry." *Colvin-el II*, 314 Md. at 13, 548 A.2d at 512.[7]

---

**7.** *Colvin-el II* divorced the point of entry argument from the issue of guilt for first degree murder. We said:

"The information developed at the post conviction hearing does not generate any reasonable probability that Colvin-[e]l was not at least an accomplice in the murder. If the basement door was only a point of attempted entry, and not a point of actual entry as Det[ective] Sturgeon testified, the discrepancy does not undermine the fact that someone entered the house, murdered Mrs. Buchman and stole jewelry and other property. There is no reasonable probability that [defense counsel] could have done anything to alter the fundamental fact that Colvin-[e]l was present and at least aiding and abetting the daytime housebreaking and robbery."

314 Md. at 15–16, 548 A.2d at 513.

The argument made in *Colvin-el II* that was relevant to the first degree principalship issue pointed to evidence "of the use of [a neigh-

When the subject resentencing was conducted, and Detective Sturgeon testified, he had retired from employment with the Baltimore County Police Department. His direct testimony at the resentencing conformed to his original report. Not unexpectedly, the cross-examination was vigorous. Sturgeon pointed out that the distance was "approximately" four inches, that he had not measured it, and that "[i]t could have been a little more." Although Sturgeon said that he could not fit through the opening, he said that some people could have squeezed in, despite the small opening.

The resentencing jury also knew that, when arrested on January 13, 1981, Colvin-el weighed 135 pounds on a five foot seven inch frame.

Defense counsel's closing argument at the resentencing presented to the jury the following suggested explanation of the facts:

"[W]hat difference does the point of entry make? It makes—I mean, somebody got into the house and killed Ms. Buchman. It makes a difference because if Mr. Colvin-el did not go in through the basement door, there is absolutely no evidence whatsoever to suggest that he ever went in the house. Circumstantial or otherwise then. That's why it makes a difference.

"And if that's so, the State's theory of this case goes up in a four inch wide puff of smoke. Then how did the people get in if all the doors, including the front, were locked, as the witnesses have said? The only possible explanation is that Ms. Buchman let them in. And I say them, because it appears to me that the facts suggest that one person could not have done this."

After three trials (with jurisdiction) and two appeals, the best that the defense could do on the first degree principalship issue with the approximately four inch opening was to argue

bor's] bike and of the presence of unknown black males in the 6800 block of Cherokee Drive ... when the murder occurred." *Id.* at 13, 548 A.2d at 512.

contrary to the twice-affirmed murder verdict, or to suggest that Mrs. Buchman let "them" in.[8] Thus, when the prosecutor told the jury in rebuttal that he "guaranteed" that "[t]o this day [Detective Sturgeon is] sorry the he ever used the term [*i.e.*, four inches]," the prosecutor was emphasizing how Sturgeon must be chastising himself over the prolonged expense and aggravation caused by his failure precisely to measure the opening. The trial court's ruling that this was permissible argument was proper.

## X

Batching under the label, "prosecutorial overreaching," the arguments considered in Parts II, III, VII–B, IX–A, and IX–B of this opinion, Colvin-el submits that the cumulative effect of the prosecutor's alleged misconduct produces a reversal. But we have not agreed with Colvin-el's assertions that there was improper conduct on the part of the prosecutor, other than in Part III, dealing with Mrs. Rubin's emotional inability to give victim impact testimony. There we also held that a mistrial was not required. Under these circumstances, there is no merit in Colvin-el's contention that the whole exceeds the sum of its parts.

## XI

 Following argument, the jury began its deliberations at approximately 3:45 p.m. The court furnished the jury with a verdict sheet, per Maryland Rule 4–343. The portions of the verdict sheet relevant to the issues in this appeal read as follows:

"Section IV

"Each individual juror shall weigh the aggravating circumstances found unanimously to exist against any mitigating circumstances found unanimously to exist, as well as against any mitigating circumstance found by that individual juror to exist.

---

**8.** In Part I hereof we held that the evidence was legally sufficient to permit a finding that Colvin-el acted alone.

"We unanimously find that the State has proven by A PREPONDERANCE OF THE EVIDENCE that the aggravating circumstances marked 'proven' in Section II outweigh the mitigating circumstances in Section III.

 ____ ____

 yes no

"Section V

"Enter the determination of sentence either 'Life Imprisonment' or 'Death' according to the following instructions:

 . . . .

"4. If Section IV was completed and marked 'no', enter 'Life Imprisonment'.

"5. If Section IV was completed and marked 'yes', enter 'Death'.

"We unanimously determine the sentence to be _____."

The jury deliberated until approximately 9:07 p.m. on the first calendar day of deliberations. The next morning, the jury resumed deliberating at approximately 9:00 a.m. At 3:00 p.m. the jurors sent the following note:

"To the Judge[:]

"IF in Section IV pg 8 we are not unanimous[,] does this default to 'NO'[?]

"IF it does default to 'NO[,]' how can we answer the question on page 9 (after # 5) 'Unanimously[?]' "

In colloquy with counsel the court indicated that it would advise the jury to answer "no" to Section IV if the jury could not unanimously agree that the aggravating factor outweighed the mitigating circumstances, and that the jury should then proceed to Section V where they would insert "Life Imprisonment."

During that colloquy defense counsel moved that the jury be dismissed and that the court enter a sentence of life imprisonment. The court ruled that it would not "dismiss the jury at this point," noting that it had deliberated approximately eleven and one-half hours.

Colvin-el's argument rests on Art. 27, § 413(k)(2) which provides that "[i]f the jury, within a reasonable time, is not able to agree as to whether a sentence of death shall be imposed, the court may not impose a sentence of death."

In *Booth v. State,* 327 Md. 142, 154, 608 A.2d 162, 167, *cert. denied,* ——— U.S. ———, 113 S.Ct. 500, 121 L.Ed.2d 437 (1992), we held that it was "the court's function to determine whether the jury's total deliberations have extended beyond a reasonable time." In the case before us voir dire and the argument of jury challenges had required four days. Opening statements, testimony, final argument, and instructions consumed five days. There were twelve witnesses for the State, and seventeen witnesses for the defendant. That degree of investment of time, effort, and resources by all concerned certainly weighed heavily, and properly so, in the trial court's decision.

Further, in *Booth,* there was also a note sent from the jury after that jury had deliberated approximately the same length of time as had the jury in the instant matter before the above-described note was sent. In *Booth,* the note advised, " 'We are unable to come to an agreement' " on whether Booth was a first degree principal. *Booth,* 327 Md. at 151, 608 A.2d at 166. Unlike the note in *Booth,* there was no categorical statement of inability to agree in the instant matter. In addition, in *Booth,* unlike the instant matter, the trial court then gave a modified *Allen* instruction. We found there was no abuse of discretion in *Booth,* where the jury came in with a death verdict in the middle of the afternoon of the third calendar day of deliberations. In the instant matter the jury returned its verdict some time later on the second calendar day of deliberations.

That verdict answered Section IV "yes," and inserted in the blank in Section V, "Death."

## XII

Colvin-el further submits that the verdict at the resentencing must be set aside because it is inconsistent with the verdict at the original trial on guilt or innocence. The initial

jury found Colvin-el guilty of murder in the first degree and specified that the finding was based both upon premeditation and upon felony murder. *Colvin-el II*, 314 Md. at 13, 548 A.2d at 511–12. The jury at the resentencing unanimously found as a nonstatutory mitigating circumstance that "the Defendant did not premeditate this murder." The point was not raised in Colvin-el's motion for a new trial filed in the circuit court. Colvin-el asks that we extend the holding in *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and hold as a matter of law that "confidence in the reliability of the judgment [on resentencing] was fatally undermined when the sentencer made a finding of fact which effectively negated an element of the offense." Brief of Appellant at 41.

As a matter of law, the issue of guilt or innocence of murder in the first degree, whether premeditated or felony murder, was not before the resentencing jury. That jury had no power to alter the guilty verdict, affirmed as part of the judgment in *Colvin-el I* and left undisturbed by *Colvin-el II*. Because premeditation, as used to distinguish one type of first degree murder in the law of homicide, was no part of the resentencing, the resentencing jury was not instructed on the law of premeditation. The jury at the trial on guilt or innocence of murder was so instructed. The earlier jury's finding represents an application of the law to the facts. The resentencing jury's use of the term, "premeditation," necessarily represents a legally uninformed, layperson's use of the term. There is no evidence that Colvin-el went to the Surell home in order to kill Mrs. Buchman. The evidence compels the inference that he seized the knife from the kitchen as a weapon of opportunity, most probably when he was surprised by his victim in a house that he thought was unoccupied. That represents a lay impression of a lack of premeditation. In law, twenty-eight stab wounds is sufficient evidence to find premeditation.

## XIII

At the argument on the motion for new trial the prosecutor, while discussing the note set forth in Part XI, *supra*, recount-

ed that one of the jurors telephoned the prosecutor after the case had concluded, indicated that that juror was telephoning defense counsel as well, and asked some questions. The prosecutor then said:

"My point is I was curious. I certainly was curious about that note. And I asked him specifically. And his response was, 'Oh, no, we didn't have any problem with section four, we had unanimously found beyond a reasonable doubt' . . . excuse me, 'to a preponderance of the evidence that the aggravating factors outweighed the mitigating factors.' He said, 'The problem came when we went to section five.' He said, 'Because there were some of us who still didn't want to give him the death penalty.' Told me two things; number one, the form works, the form works."

Defense counsel made no point of the prosecutor's comments to the circuit court. On this appeal Colvin-el interprets the prosecutor's description to mean that "some of the jurors clearly believed the death penalty inappropriate but nevertheless felt compelled to vote for it because of the operation of the form." Brief of Appellant at 42. Citing, *inter alia, Mills v. Maryland,* 486 U.S. at 376–77, 108 S.Ct. at 1866–67, 100 L.Ed.2d at 394–96, Colvin-el contends that "the necessary degree of certainty and reliability was undermined by the possibility that the jurors (or some of them) believed that they were compelled to vote for death by the operation of the form, thus rendering the statute mandatory in its application to this case." Brief of Appellant at 42–43.

The well-settled Maryland rule is that jurors cannot be heard to impeach their verdict. *Wernsing v. General Motors Corp.,* 298 Md. 406, 411–12, 470 A.2d 802, 804–05 (1984) (collecting cases); *Oxtoby v. McGowan,* 294 Md. 83, 101, 447 A.2d 860, 870 (1982). *A fortiori,* a verdict may not be impeached by hearsay attributed to a juror declarant.

In any event, the description related by the prosecutor does not indicate that any juror was compelled by the form, or otherwise, to impose a death penalty. Consistent with the prosecutor's description is that there was a further discussion

after "yes" had been answered to Section IV and before "death" was inserted in Section V. One effect of the Maryland form is that the jury's knowledge that a "yes" answer in Section IV results in the imposition of a sentence of death is reinforced when Section V is completed by the entry of the sentence.

We know from the verdict sheet that one or more, but less than all, of the jurors had found two nonstatutory mitigating factors. The trial court had instructed the jury that "[e]ach one of you should individually consider each [mitigating] circumstance." The court further instructed "that the burden of proof operates with respect to each juror individually, and you must not surrender your honest conviction as to the existence or non-existence of a mitigating circumstance solely because of the opinion of your fellow jurors." Whether one or more of the jurors took longer than others to join in the unanimous verdict is quite immaterial. Each juror signed the verdict sheet. The jury was individually polled in open court, and each juror confirmed the verdict.

We shall not disturb the verdict.

## XIV

We have also considered the factors enumerated in Art. 27, § 414(e) and determined: (1) that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) that the evidence supports the jury's finding of the statutory aggravating circumstance that the murder was committed in the course of committing robbery; and (3) that the evidence supports the jury's finding that the aggravating circumstance outweighs the mitigating circumstances.

JUDGMENT AFFIRMED.

ROBERT M. BELL, Judge, in part I. of which ELDRIDGE, J. joins.

I respectfully dissent from the affirmation of the death penalty in the case *sub judice.* I do so for two reasons: (1)

the evidence was wholly insufficient to establish the petitioner's principalship in the first degree and (2) the trial court erred when it refused to dismiss the jury after it had deliberated for a reasonable amount of time.

## I.

### A.

This is the third time this case has reached this Court for review. On the first occasion, *see Colvin v. State,* 299 Md. 88, 472 A.2d 953 (1984) (*Colvin-el I*), the petitioner's convictions and death sentence were affirmed. Pertinent to the issues *sub judice,* the majority in that case held that the evidence that the petitioner's fingerprints were on broken glass from the basement door, the supposed point of entry, and the petitioner pawned two items taken in the daytime housebreaking and robbery sufficiently proved the petitioner's criminal agency. 299 Md. at 110–112, 472 A.2d at 964. As to the former, relying on, among others, the facts that the premises were a private residence not generally accessible to the public and the basement was located in the back of the house, the Court concluded "that the circumstances surrounding the fingerprints found on the glass broken on the basement door tend to exclude the hypothesis that the print was impressed at a time other than that of the crime." *Id.* at 111, 472 A.2d at 964.

The petitioner filed post conviction proceedings, alleging the incompetency of his counsel. The hearing court granted him a new sentencing hearing but denied relief as to the convictions. We reviewed those proceedings at the instance of the State. *State v. Colvin,* 314 Md. 1, 548 A.2d 506 (1988). (*Colvin-el II*) We affirmed.

The Court was not impressed insofar as the petitioner's incompetency of counsel claim was directed to the petitioner's convictions. It noted:

None of the foregoing demonstrates the reasonable probability that Colvin–El would have been found innocent of first

degree murder and of the underlying felonies if Payne [the petitioner's counsel] had utilized the specified information for cross-examination or as evidence in a defense case. First, none of the Monday morning quarterbacking casts any doubt on the fact that Colvin–El was present at the basement door of the Sorrell home after Ms. Susan Sorrell had left and before Mrs. Buchman's body was found.

\* \* \* \* \* \*

Thus, it is fanciful to suggest, as Colvin–El does, that Payne should have caused the jury to be uncertain whether Colvin–El was the thief because he might have found the jewelry or might have received it from the true thief sometime after the crime. That does not explain away the fingerprints.

314 Md. at 14, 548 A.2d at 512 (footnote omitted). Moreover, the Court observed:

The information developed at the post conviction hearing does not generate any reasonable probability that Colvin–El was not at least an accomplice in the murder. If the basement door was only a point attempted entry, and not a point of actual entry as Detective Sturgeon testified, the discrepancy does not undermine the fact that someone entered the house, murdered Mrs. Buchman and stole jewelry and other property. There is no reasonable probability that Payne could have done anything to alter the fundamental fact that Colvin–El was present and at least aiding and abetting the daytime housebreaking and robbery.

*Id.* at 15–16, 548 A.2d at 513.

As regards the sentencing phase of the proceedings, the Court assumed that counsel's ineffectiveness may have resulted in the jury not concluding that there was more than one person involved in the murder and that, but for that ineffectiveness, counsel would have been able to adduce sufficient evidence to generate a reasonable doubt as to whether the petitioner was the actual killer. To the extent that the petitioner was prejudiced by that there was prejudice, "if any," *Id.* at 16, 548 A.2d at 513. Curiously, while mentioning,

as relevant to resentencing, the presence of strangers in the neighborhood and the movement of the bicycle from the neighbor's yard, the Court did not specify that the jury should also consider, when deciding the first degree principalship issue, whether the petitioner entered the premises through the basement door.

## B.

To be eligible for the death penalty, a defendant must have been a principal in the first degree; he or she must be shown to have been the actual perpetrator of the murder. Maryland Code (1957, 1992 Repl.Vol.) Art. 27 § 413(e)(1); Maryland Rule 4–343(e); *Wiggins v. State*, 324 Md. 551, 584, 597 A.2d 1359, 1375 (1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992); *Johnson v. State*, 303 Md. 487, 510, 495 A.2d 1, 12 (1985), *cert. denied*, 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907, (1986); *Stebbing v. State*, 299 Md. 331, 371, 473 A.2d 903, 923, *cert. denied*, 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984).[1] It is of no consequence that, in *Colvin-el I*, we affirmed the petitioner's conviction of first degree murder and, in *Colvin-el II*, declined to upset it on the basis of the record developed at the post conviction proceeding. Those cases demonstrate only that the evidence has been found to be sufficient to convict the defendant of being at least a principal in the second degree; they do not relieve the trier of fact in the sentencing proceeding of its obligation of determining, as a prerequisite to imposing the death penalty, whether the petitioner, in fact, committed the murder by his own hand. See Art. 27 § 413(e)(1).

In reviewing the sufficiency of the evidence of the petitioner's principalship in the first degree, we apply the test enunciated in *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979): "Whether, after viewing the evidence in the light most favorable to the prosecution,

---

1. The only exception to this Rule, not applicable here, is when the defendant employs another to commit murder. *See* Maryland Code (1957, 1992 Repl.Vol.) Art. 27 § 413(d)(7) and § 413(e)(1).

*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Wiggins,* 324 Md. at 566–67, 597 A.2d at 1366; *Tichnell v. State,* 287 Md. 695, 717, 415 A.2d 830, 842 (1980). Furthermore, the death penalty is qualitatively different from other sentences. Consequently, greater certainty is required in finding that the jury's conclusion that the petitioner was the principal in the first degree was correct and rested on proper grounds. *See Mills v. Maryland,* 486 U.S. 367, 376–77, 108 S.Ct. 1860, 1866–67, 100 L.Ed.2d 384, 395–96 (1988); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973, 989 (1978). Moreover, because the evidence upon which the finding that the petitioner was the principal in the first degree is premised is entirely circumstantial, that finding "is not to be sustained unless the circumstances are inconsistent with any reasonable hypothesis of innocence." *West v. State,* 312 Md. 197, 211–212, 539 A.2d 231, 238 (1988). *See also Hebron v. State,* 331 Md. 219, 224, 627 A.2d 1029, 1030–31 (1993); *Wilson v. State,* 319 Md. 530, 536–37, 573 A.2d 831, 834 (1990). Whether or not the matter is tried to a jury, the question whether the circumstances are inconsistent with a reasonable hypothesis of innocence is addressed to the trial court; it must be decided initially by the trial court, for if there are no such circumstances, then there is no basis for a jury decision on the matter. *Hebron,* 331 Md. at 233–34, 627 A.2d at 1036.

## C.

The majority rejected the petitioner's argument that the State did not sufficiently prove that he was a principal in the first degree on two grounds. First, relying on the testimony of the victim's granddaughter, it held that it was established that the petitioner's fingerprints were impressed on the basement door glass at the time of the crime. Then, reasoning from the nature of the document and its location, the majority opines that the jury could logically have determined that the fingerprint on the notebook page had nothing to do with the

murder. In reaching these conclusions, it all but ignores the other fingerprint evidence and the petitioner's point of entry argument.[2]

It is not disputed that the petitioner possessed within eight days of the murder, two items which were among the pieces of jewelry taken from the Surell home. Nor is it disputed that the petitioner's fingerprints were impressed on pieces of glass from the basement door window. From this, the State theorizes that the petitioner broke the glass in the door, placed it on the steps, reached into the house and undid the security locks, opened the door, and entered the Surell home. While in the home, it continues, he was surprised by the victim. Grabbing a knife from the kitchen, he stabbed her 28 times, causing her death. Then, the petitioner took the money from the victim's handbag and wallet and went into the master bedroom and took the jewelry. Thus, critical to the State's theory of the case is that the petitioner entered the house through the basement door.

During the resentencing proceeding, the issue whether the petitioner could have gained entry through the basement door was hotly contested. Unlike at his original trial and sentenc-

---

2. In connection with the petitioner's improper closing argument contentions, the majority alludes to how it treated the point of entry issue in *State v. Colvin*, 314 Md. 1, 14, 548 A.2d 506, 512 (1988). In that case, the argument was divorced from the issue of the petitioner's guilt of first degree murder, the Court noting that whether or not the petitioner entered the house through the basement door, someone entered the house and murdered Mrs. Buchman. The Court concluded that, at the very least, the petitioner was present as an aider and abettor of daytime housebreaking and robbery. 314 Md. at 15–16, 548 A.2d at 513. From the Court's recitation of the particulars in which the petitioner alleged that his counsel was ineffective, 314 Md. at 13–14, 548 A.2d at 512, it may be assumed that the petitioner did not raise, in the post conviction proceedings, the point of entry argument as it related to sentencing. Be that as it may, at the resentencing in this case, the petitioner did vigorously challenge the State's theory that he entered the premises through the basement door. And, since that was the State's only theory of how entry was gained, it was critical that the evidence presented at the resentencing hearing support it. As I will demonstrate, it does not.

ing,[3] Detective Sturgeon was cross-examined extensively on whether, given the limited extent that the door could open, it was possible for the basement door to be the point of entry. Sturgeon testified that he could find no point of forced entry other than the basement door and, so, that the basement door had to be the point of entry. The petitioner's counsel's observation that, "Even though the door could only be opened four inches," was met only with the response, "Approximately four inches." Sturgeon later volunteered that "It looked wide enough for somebody to get ... no, not me."

Detective Sturgeon's testimony revealed the reason the door could not be fully opened—a white metal storage cabinet was up against the door. A photograph of that area of the basement confirms Detective Sturgeon's observation with regard to the white metal storage cabinet.[4] Indeed, in *Colvin-el II*, 314 Md. at 10, 548 A.2d at 510, the Court described that photograph as showing

> a white metal storage cabinet in front of the hinged side of the door standing to a height slightly above that of the door knob. The back of the cabinet is flush against a wall which is perpendicular to the exterior wall in which the door is set. The front of the metal cabinet extends beyond the hinged edge of the door to a point approximately half way across the width of the door. On the opposite side of the door from the storage cabinet and extending perpendicularly from the exterior wall were a clothes dryer and a clothes washer.[5] The distance between those two machines and

---

**3.** Despite Detective Sturgeon's report containing the comment that "the door could be opened, but only approx. four inches," the petitioner's counsel conducted no cross-examination on whether it was possible for the petitioner to pass through an opening approximately four inches. This was one of the bases for the petitioner's allegation, in the post conviction proceedings, that he received ineffective assistance of counsel.

**4.** Not only does that picture reveal a metal cabinet, but that it was piled high with other items.

**5.** The washer and dryer extended to within a few inches of the door frame and, thus, were very close to the door on the knob side. That

the storage cabinet is only several inches more than the width of the ironing board.[6]

The Court also assessed the conclusions that the jury could properly have drawn from the testimony and photograph,

A fact finder could find that one attempting to open the basement door from the outside would not see the storage cabinet because of the curtain over the windows of the door. Furthermore, even if all of the locks on the door had been unlocked, a fact finder could conclude that the door would not open more than the four inches described in Det. Sturgeon's report because the door would strike the cabinet and the cabinet would not move because it butts against the wall. A fact finder could also believe that, had the folded ironing board been leaning against the knob side of the door in its described, customary position, anyone attempting to enter the basement by opening the door would knock the folded ironing board to the floor.

*Id.*

Although Detective Sturgeon testified initially that he could not tell if the cabinet had been moved, when pressed, he indicated that he did not find any evidence that it had been. Moreover, Detective Sturgeon also acknowledged under cross-examination that, while the ironing board was lying on the floor in front of the door, the ironing board cover did not appear to have been disturbed, *i.e.,* there were no footprints on it. Sturgeon was not able to testify that the items on top of the washer and dryer, which were within a very few inches of the door frame and, thus, very close to the knob side of the door, had been disturbed. The only explanation for Detective Sturgeon's conclusion that the basement door was the point of entry is his testimony that: "I could not find any other way into the house. The . . . I said approximately four inches. It

---

constricted the space into which one entering that door would have to pass.

**6.** There was testimony that an ironing board was usually stored leaning against the basement door. In the photograph the ironing board was lying on the floor in front of the door.

could have been a little more." Aside from indicating that the opening looked large enough for some human beings to get through, the detective very pointedly noted that he could not and he did not venture to characterize just how much more than four inches the door could open.

Four inches is an extremely small space through which to pass. The petitioner at the time of the offense was 5'7" and weighed 135 lbs. It is inconceivable that a man of that size could pass through an opening of only four inches. There was no testimony in the record that the petitioner was unusually thin or adept at passing through small spaces. But even if there were, an opening of four inches, or in Detective Sturgeon's words, "a little more," will not accommodate a man's head. As the petitioner's counsel argued in closing argument, perhaps Gumby, given the flexibility of its body, including its head, could have passed through such a small opening, but no adult could.

The State apparently concedes that it would be impossible for an adult man to pass through a four inch opening. It relies, however, on Detective Sturgeon's conclusion that the opening was wide enough for a man, not him, but presumably the petitioner, to pass through. The State is obviously of the view that Detective Sturgeon, an experienced police officer and lab technician, is more adept at determining whether an opening will accommodate a man than in characterizing, in inches, the width of a particular opening. But there is simply no basis for that conclusion. Presumably, the detective utilized his concededly vast police and lab technician experience when he estimated how far the door would open. Indeed, the fact that the metal cabinet extended to the middle of the door, at a height higher than the door knob, is corroborative of Detective Sturgeon's estimate as to how far the door would open. Logic teaches that a door so obstructed could not open very far. Moreover, the detective's testimony that the metal storage cabinet had not been moved is even more corroborative.

Detective Sturgeon said that, by characterizing the opening as approximately four inches, he meant to indicate that the door could open a little more than four inches. At no time, however, did he say how much more. And, at no time, did the State produce evidence to show just how much more the door would open, or just how wide the opening needed to be to allow access by an adult male. Six inches is a "little more" than four inches. Nevertheless, it seems just as impossible that an adult male, 5'7" tall and 135 lbs, could pass through an opening that size. Again, the head cannot contract, it is not flexible enough to make adjustments necessary to accommodate a small space.

Without a predicate more substantial than, "it opened wide enough for a man to pass through," there simply was no basis for *any* rational trier of fact to find that the opening was sufficiently wide to allow the petitioner to pass through. The jury could only have adopted the State's theory that the petitioner entered the house through the basement door by crediting Detective Sturgeon's *conclusion* that the door opened wide enough to admit an adult man. That, in turn, required the jury to reject both Detective Sturgeon's initial conclusion and the objectively verifiable evidence bearing on the issue, upon which, by the way, Detective Sturgeon relied for both opinions. Permitting a jury to make a factual finding on the basis of conclusions for which the record offers *no* support cannot be justified or countenanced.

The state's point of entry evidence was insufficient for another reason. The area immediately in front of the basement door showed no signs of entry. Detective Sturgeon testified that there were no footprints on the ironing board and the items on the washer/dryer "didn't look disturbed." This is important because the ironing board took up all but a couple of inches of the walking surface immediately in front of the door, presenting no room for one entering through that door to proceed except by walking over the ironing board or climbing over the washer and dryer, thereby disturbing the material that was on top of the washer and dryer.

D.

Like the point of entry, the fingerprint evidence bears significantly on the question whether the State produced sufficient circumstantial evidence of the petitioner's criminal agency to exclude a reasonable hypothesis that he was not the actual murderer. That the State's case against the petitioner was purely circumstantial cannot be doubted. There was no direct evidence of the petitioner's involvement in the murder, only inferences to be drawn from his fingerprints being on the broken glass from the basement door and his possession of property taken during the daytime housebreaking and robbery. The petitioner denied that he committed the murder. To support that contention and his further contention that someone else did, the petitioner relied on the State's inability to match his fingerprints with those latent non-elimination fingerprints, of comparison value, lifted from various places inside the house.

A number of latent prints was lifted from various locations in the house. With the exception of the fingerprints lifted from the broken glass from the basement door, none of them could be matched with the petitioner's prints. As to most of them, and, in particular, the palm print lifted from the refrigerator, the fingerprint lifted from kitchen door frame, and the fingerprints and partial palm print lifted from the lawn chair, Mr. Simms, formerly the supervisor of the latent print section of Baltimore County Crime Lab and the fingerprint expert, testified that this meant that it could not definitively be said either that they were the petitioner's or that they were not. There simply were not enough points of comparison to permit a positive identification with known prints with which they were compared, he said. In other words, failure to obtain a match did not eliminate either petitioner or any other person who did not belong in the house, including those suspects with whose prints the latent prints were compared, as the source of the prints.

One fingerprint, that lifted from a page in the victim's notebook, found in the victim's handbag, was definitely deter-

mined not to have been made by the petitioner or by any of the victim's family. Mr. Simms so testified. Indeed, he indicated that given the very different patterns of the two prints, only a cursory examination of that latent print and the petitioner's-fingerprints was sufficient to exclude the petitioner as its source.

Notwithstanding the State's theory, apparently adopted by the jury, that the fingerprint on the notebook page was most probably that of the person whose name appeared on that page and, consequently, had no relevance to the murder, the mere presence of that fingerprint and its lack of connection with petitioner, as well as the presence of other non-elimination, comparison value prints also found inside the house, support the petitioner's argument that he did not commit the murder, *i.e.*, that he was not a principal in the first degree.[7] That evidence, taken together, also supports the hypothesis that someone other than the petitioner was in the house and that that someone committed the murder. In that regard the fingerprint on the notebook page is particularly important. From it could be inferred that the murderer left his or her fingerprint when, in the course of looking for money, he or she ransacked the victim's handbag and its contents. Notwithstanding, and perhaps because of its inconclusiveness, the other fingerprint evidence is also important. Because the source of those prints could not be definitively established, they cannot be the basis for the jury finding that the petitioner was inside the house. Therefore, unless there is evidence that otherwise places the petitioner inside the house, this evidence is an insufficient predicate from which to infer that the petitioner committed the murder. In other words, inconclusive fingerprint evidence does not become sufficient simply

---

7. The majority takes the position that the jury could have found that the murderer would not have taken the time to go through the victim's notebook after having ransacked the handbag and found her money. Curiously, however, it was the police who saw fit to take latent prints from that notebook. This is consistent, of course, with its theory that the murderer robbed the victim and that in the process of looking for her money, handled and looked through the notebook, possibly leaving his or her fingerprints on one of its pages.

because the defendant is placed in the area of the crime at or about the time it was committed. Thus, viewed by itself, the fingerprint evidence is, at best, consistent with the petitioner being, as this Court theorized in *Colvin-el II*, 314 Md. at 16, 548 A.2d at 513, an aider and abettor of the crimes of daytime housebreaking and robbery.

Because the fingerprint and other evidence developed inside the house do not link the petitioner to the murder, his death sentence can be sustained only if the evidence that does link him to the crime is sufficient to place him inside the house. While in the context of the guilt-innocence phase of a trial, it may be, ordinarily, appropriate to be less concerned with the petitioner's actual entry into the house, it being unnecessary in that proceeding to prove that he actually killed the victim, that is not true in the context of this capital sentencing proceeding. The recognition and proof that "someone entered the house, murdered [the victim], and stole jewelry and other property," *Colvin-el II*, 314 Md. at 15–16, 548 A.2d at 513, does not establish, for sentencing purposes, who the first degree principal was; thus, it does not help the State. The critical issue that leaves unanswered is *who* that someone was that murdered the victim. Consequently, unless the State's evidence permitted a rational jury to find that the petitioner actually entered the house through the basement door, that being its only theory of entry, the issue of the petitioner's criminal agency as a first degree principal should not have been submitted to the jury. The jury is required to resolve issues presented to it on the basis of evidence, not speculation.

The majority does not address the petitioner's point of entry argument in the context of the petitioner's challenge to the sufficiency of the evidence; rather, it touches on the issue only in connection with the petitioner's claim that the State engaged in improper jury argument. But that issue is extremely critical to the propriety of the death sentence imposed in this case.

As the petitioner argued in closing argument, unless, given the State's theory, he can be placed in the house through the

approximately four inch opening in the basement door, there simply is no evidence that he committed the murder. The State's only theory was that the petitioner, acting alone, entered the house through the basement door, and committed the murder when he was surprised by the victim. That theory works only if the petitioner is placed inside the house, in the manner alleged by the State. As I have demonstrated, the testimony of Detective Sturgeon, which the State offered in support of its theory, was wholly insufficient in that regard. Accordingly, it is appropriate to repeat that, in the context of proving first degree principalship, it is not enough to surmise, as the Court did in *Colvin-el II,* that someone entered the house and killed the victim. The critical inquiry is who that someone was. Surmise simply is not acceptable as proof.

The inferences to be drawn from the circumstantial evidence connecting the petitioner to the crimes may suffice to sustain the petitioner's guilt of first degree murder. Given the fingerprint evidence, they clearly do not suffice to prove the petitioner's first degree principalship. Indeed, on that issue, the best that can be said is that the case is exceedingly weak. Moreover, the evidence as to the point of entry, indicating as it does that the point the State identifies could only be a point of attempted entry, further exposes the weakness of the State's circumstantial case against the petitioner as the actual perpetrator of the murder. It becomes weaker still when the evidence of other suspects, combined with the neighbors' testimony concerning the presence in the area, at about the time the crimes occurred, of other persons who could possibly have committed the offenses, are considered.

Merely because the petitioner's first degree murder conviction has twice been affirmed does not mean the jury finding that he was a principal in the first degree must be upheld. The proof necessary to establish these two propositions may be, and, in this case, is, quite different. To sustain the former, proof that the petitioner aided and abetted the daytime housebreaking and the robbery is enough; the State need not prove, in other words, that the petitioner was a principal in

the first degree. *See Colvin-el II,* 314 Md. at 16, 548 A.2d at 513. On the other hand, the finding that the petitioner was the principal in the first degree may only be upheld on evidence that the petitioner committed the murder by his own hand. When the issue is the petitioner's first degree principalship, and there are indications that the petitioner may not have acted alone, it is not enough merely to prove the petitioner's presence at the time of the murder or even his possession of the fruits of the crime; it must also be shown that the petitioner actually committed the murder. Of necessity, therefore, this requires the State to establish that the petitioner was in the house, rather than at the basement door, when the murder occurred. The State failed utterly in its proof in this regard. In the first place, it did not prove that it was possible for the petitioner to have gained entry at the alleged point of entry. Second, while possession of the fruits of a recent daytime housebreaking and robbery will support an inference that the possessor is the thief, that is true, ordinarily, only when there is no evidence "undermining the inference from the evidence that the defendant was guilty." *Hebron,* 331 Md. at 231, 627 A.2d at 1035. In the case *sub judice,* the State's failure to prove entry, the fingerprint found not to be that of the petitioner, and the inconclusive fingerprint evidence constitute evidence undermining the inference that the petitioner was the principal in the first degree. Moreover, given that evidence, there is "no basis upon which a rational finder of fact could [find that the petitioner was the principal in the first degree] without speculating as to which of the two versions is the correct version." *Id.* at 234, 627 A.2d at 1036. Thus, while, as we have already held, placing the petitioner at the basement door when the murder, daytime housebreaking, and robbery occurred and, eight days thereafter, in possession of some of the fruits of those crimes, may be enough to find the petitioner guilty of first degree murder, it falls well short of being sufficient to establish that he committed the murder.

To reiterate, tending to prove that the petitioner was a principal in the first degree in the victim's murder are the petitioner's fingerprints found on broken glass taken from the

basement door and the petitioner's pawning, eight days after the murder, two items taken in the daytime housebreaking. On the other hand, the facts that the basement door would only open "approximately" four inches, that the petitioner's fingerprints were not matched with any of the latent prints lifted from the interior of the house, that the fingerprint on a page of the victim's notebook, found in the victim's handbag, was definitely not the petitioner's and that there were other persons in the area at about the time of the crimes who could have committed them all tend to disprove that proposition. What we have, therefore, is a weak circumstantial case, made weaker by evidence, tending to negate the petitioner's first degree principalship, that the petitioner could not gain entry as the State alleged. I agree with Judge Eldridge, speaking in dissent in *Wiggins v. State*, 324 Md. at 587, 597 A.2d at 1376, while, viewed in isolation, that evidence may not support a reasonable hypothesis that another person was present when the crime was committed; however, "[w]hen this evidence is added to an already weak circumstantial case, ... the combination leads to the conclusion that the evidence at the sentencing hearing was not sufficient to establish, beyond a reasonable doubt, that [the petitioner] was the principal in the first degree."

## II.

For the reasons I stated in my dissents in *Bruce v. State*, 328 Md. 594, 632, 616 A.2d 392, 411 (1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2936, 124 L.Ed.2d 686 (1993); *Oken v. State*, 327 Md. 628, 683–89, 612 A.2d 258, 285–88 (1992), and *Booth v. State*, 327 Md. 142, 203–17, 608 A.2d 162, 192–99, *cert. denied*, —— U.S. ——, 113 S.Ct. 500, 121 L.Ed.2d 437 (1992) I also dissent from Part XI of the majority opinion. It is a perfectly acceptable outcome for the jury not to agree, *see* Maryland Code (1957, 1992 Repl.Vol.) Art. 27, § 413(k)(2), and I continue to believe that the jury should be told and, thus, know, that.

ELDRIDGE J. concurs in all but part II. of this dissenting opinion.